# 21-2547

& 21-2576

## United States Court of Appeals
## for the Second Circuit

In re TRANSCARE CORPORATION,

*Debtor.*

(*Captions Continued on Inside Cover*)

On Appeal from Final Judgments of the
U.S. District Court, Southern District of New York (Kaplan, J.)

**BRIEF FOR DEFENDANTS-APPELLANTS**

Michael T. Mervis
PROSKAUER ROSE LLP
11 Times Square
New York, N.Y. 10036
(212) 969-3000

Mark A. Perry
Miguel A. Estrada
Kellam M. Conover
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Defendants-Appellants Lynn Tilton; Patriarch Partners Agency
Services, LLC; Transcendence Transit, Inc.; and Transcendence Transit II, Inc.*

SALVATORE LAMONICA, as Chapter 7 Trustee of the Jointly-Administered Estates of TransCare Corporation, et al.,

*Plaintiff-Appellee*,

SHAMEEKA IEN,

*Plaintiff*,

v.

LYNN TILTON,

*Defendant-Appellant*,

PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 20011, LIMITED, ARK INVESTMENT PARTNERS II, L.P., LD INVESTMENTS, LLC, PATRIARCH PARTNERS II, LLC, PATRIARCH PARTNERS III, LLC, PATRIARCH PARTNERS VIII, LLC, PATRIARCH PARTNERS XIV, LLC, PATRIARCH PARTNERS XV, LLC, TRANSCENDENCE TRANSIT, INC., TRANSCENDENCE TRANSIT II, INC.,

*Defendants*.

———————————————

In re TRANSCARE CORPORATION,

*Debtor*.

PATRIARCH PARTNERS AGENCY SERVICES, LLC, TRANSCENDENCE TRANSIT, INC., TRANSCENDENCE TRANSIT II, INC.,

*Appellants*,

v.

SALVATORE LAMONICA, as Chapter 7 Trustee of the Jointly-Administered Estates of TransCare Corporation, et al.,

*Trustee-Appellee*.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned hereby certifies as follows:

Appellant Patriarch Partners Agency Services, LLC ("PPAS") has no parent company and no publicly held corporation owns 10% or more of PPAS.

Appellant Transcendence Transit, Inc. has no parent company and no publicly held corporation owns 10% or more of Transcendence Transit, Inc.

The parent company of Appellant Transcendence Transit II, Inc. is Transcendence Transit, Inc.  No publicly held corporation owns 10% or more of Transcendence Transit II, Inc.

Dated:      March 29, 2022

/s/ Mark A. Perry
Mark A. Perry

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.......................................................5

ISSUES PRESENTED..........................................................................6

PERTINENT STATUTES......................................................................6

STATEMENT OF THE CASE...............................................................6

I.    Factual Background ...................................................................7

    A.    TransCare Experienced Significant Financial Distress........................8

    B.    Tilton Considered Various Options to Save TransCare......................10

    C.    Tilton Developed the Restructuring Plan............................................14

    D.    The Patriarch Entities Executed the Restructuring Plan ....................16

    E.    After TransCare Filed for Bankruptcy, the Trustee Prevented Transcendence from Operating and Repaying Creditors....................17

II.    Procedural History ...................................................................18

SUMMARY OF ARGUMENT .............................................................22

STANDARD OF REVIEW ..................................................................24

ARGUMENT ......................................................................................24

I.    The Transaction Was Not Unlawful........................................25

    A.    The Transaction Was Not an Actual Fraudulent Conveyance...........26

        1.    Tilton's Subjective Intent Was to Benefit Creditors.................27

        2.    The Courts Below Erred by Ignoring Tilton's Subjective Intent .......................................................................31

    B.    Tilton Did Not Breach Her Fiduciary Duties to TransCare...............35

# TABLE OF CONTENTS
## (continued)

Page

1.    Fair Price Alone Satisfies the Entire-Fairness Standard...........36

2.    TransCare Received a Fair Price for the Subject Collateral ................................................................................42

3.    Tilton Engaged in Fair Dealing................................................47

II.   The Courts Below Committed Legal Error In Awarding Damages.............51

    A.    The Estate Is Entitled to No Damages for Any Actual Fraudulent Conveyance ........................................................51

        1.    The Transfer Caused No Damages ...........................................52

        2.    Going-Concern Value Is Improper as a Matter of Law ...........55

    B.    The Estate Is Entitled to No Damages for Any Breach of Fiduciary Duties ..........................................................60

        1.    The Trustee Failed to Prove Actual Harm ...............................60

        2.    Going-Concern Value Is Improper as a Matter of Law ...........62

        3.    The Court Should Award Nominal Damages Only .................62

CONCLUSION .......................................................................................63

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*,
  935 F.3d 93 (2d Cir. 2019) ................................................................24

*In re Acequia, Inc.*,
  34 F.3d 800 (9th Cir. 1994) ..............................................................33

*ACP Master, Ltd. v. Sprint Corp.*,
  2017 WL 3421142 (Del. Ch. July 21, 2017) ....................................37

*In re Adler, Coleman Clearing Corp.*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999)............................................55, 56

*In re Am. Classic Voyages Co.*,
  367 B.R. 500 (Bankr. D. Del. 2007)..............................................42, 43

*In re Andrew Velez Constr., Inc.*,
  373 B.R. 262 (Bankr. S.D.N.Y. 2007)...........................................52, 53

*In re Bean*,
  252 F.3d 113 (2d Cir. 2001) .........................................................52, 53

*In re Belmonte*,
  931 F.3d 147 (2d Cir. 2019) ..............................................................51

*Blackmore Partners, L.P. v. Link Energy LLC*,
  864 A.2d 80 (Del. Ch. 2004) ........................................................37, 42

*In re Bonnanzio*,
  91 F.3d 296 (2d Cir. 1996) ................................................................27

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ..................................................................59

*In re Bremer*,
  408 B.R. 355 (B.A.P. 10th Cir. 2009) ...............................................53

*Cadle Co. v. Newhouse*,
  20 F. App'x 69 (2d Cir. 2001) ...........................................................27

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Cancan Dev., LLC v. Manno*,
  2015 WL 3400789 (Del. Ch. May 27, 2015)................................37, 42

*In re Chin*,
  492 B.R. 117 (Bankr. E.D.N.Y. 2013) ...............................................33

*Cinerama, Inc. v. Technicolor, Inc.*,
  663 A.2d 1156 (Del. 1995) ....................................................37, 42, 61

*In re Coated Sales, Inc.*,
  144 B.R. 663 (Bankr. S.D.N.Y. 1992).........................................38, 55

*In re Colonial Realty Co.*,
  226 B.R. 513 (Bankr. D. Conn. 1998) ...............................................57

*In re Condon*,
  198 F. 947 (S.D.N.Y. 1912)...............................................................28

*Culver v. Bennett*,
  588 A.2d 1094 (Del. 1991) ................................................................60

*Curtis T. Bedwell & Sons, Inc. v. Int'l Fid. Ins. Co.*,
  843 F.2d 683 (3d Cir. 1998) .......................................................55, 56

*Duncan v. First Nat'l Bank of Cartersville*,
  597 F.2d 51 (5th Cir. 1979) ...............................................................32

*In re Earle*,
  307 B.R. 276 (Bankr. S.D. Ala. 2002)...............................................33

*In re EBC I, Inc.*,
  380 B.R. 348 (Bankr. D. Del. 2008)...................................................55

*In re Eubanks*,
  444 B.R. 415 (Bankr. E.D. Ark. 2010) .........................................33, 35

*Excelsior Cap. LLC v. Allen*,
  536 F. App'x 58 (2d Cir. 2013) .........................................................60

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re First Cent. Fin. Corp.*,
    377 F.3d 209 (2d Cir. 2004) ...............................................................24

*Gesoff v. IIC Indus., Inc.*,
    902 A.2d 1130 (Del. Ch. 2006) .........................................................62

*Glassman v. Unocal Expl. Corp.*,
    777 A.2d 242 (Del. 2001) ..................................................................50

*Hausman v. Buckley*,
    299 F.2d 696 (2d Cir. 1962) ..............................................................24

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) ................................................................26

*In re HHE Choices Health Plan, LLC*,
    2019 WL 6112679 (Bankr. S.D.N.Y. Nov. 15, 2019)......................43

*Ien v. TransCare Corp.*,
    614 B.R. 187 (Bankr. S.D.N.Y. 2020).................................................8

*In re Jeffrey Bigelow Design Grp., Inc.*,
    956 F.2d 479 (4th Cir. 1992) ......................................................22, 31

*Kelly v. Armstrong*,
    206 F.3d 794 (8th Cir. 2000) ..............................................22, 32, 35

*In re Kenney*,
    2020 WL 2311876 (Bankr. D.N.J. May 8, 2020)............................35

*In re Khan*,
    2014 WL 10474969 (E.D.N.Y. Dec. 24, 2014).................................31

*Kirschner v. KPMG LLP*,
    938 N.E.2d 941 (N.Y. 2010).............................................................26

*In re Labsource, LLC*,
    632 B.R. 724 (Bankr. D.S.C. 2021)..................................................57

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*,
2014 WL 5192179 (Del. Ch. Oct. 10, 2014) ....................................................62

*Lauder v. First Unum Life Ins. Co.*,
284 F.3d 375 (2d Cir. 2002) ..............................................................................24

*In re Lyondell Chem. Co.*,
554 B.R. 635 (S.D.N.Y. 2016) ..........................................................................26

*In re Lyondell Chem. Co.*,
567 B.R. 55 (Bankr. S.D.N.Y. 2017)............................................................28, 31

*In re M. Silverman Laces, Inc.*,
404 B.R. 345 (Bankr. S.D.N.Y. 2009)...............................................................55

*In re Mama D'Angelo, Inc.*,
55 F.3d 552 (10th Cir. 1995) ..............................................................23, 43, 55

*Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*,
926 F.2d 1248 (1st Cir. 1991)............................................................26, 32, 35

*McCord v. Ally Fin., Inc.*,
559 B.R. 41 (Bankr. E.D.N.Y. 2016) .............................................................31, 32

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005) ..............................................................................24

*Murphy v. RMTS Assocs., LLC*,
71 A.D.3d 582 (N.Y. App. Div. 2010) ...............................................................60

*New Haven Inclusion Cases*,
399 U.S. 392 (1970)........................................................40, 43, 44, 56

*Oberly v. Kirby*,
592 A.2d 445 (Del. 1991) ..................................................................................39

*Oliver v. Boston Univ.*,
2006 WL 1064169 (Del. Ch. Apr. 14, 2016)......................................................62

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Olsen Indus., Inc.*,
2000 WL 376398 (D. Del. Mar. 28, 2000) ........................................................60

*OptimisCorp v. Waite*,
2015 WL 5147038 (Del. Ch. Aug. 26, 2015) ....................................................63

*In re Opus E. LLC*,
698 F. App'x 711 (3d Cir. 2017) .......................................................................47

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000) ..............................................................................59

*In re Schwinn Bicycle Co.*,
192 B.R. 477 (Bankr. N.D. Ill. 1996) ................................................................56

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
568 B.R. 481 (Bankr. S.D.N.Y. 2017) ........................................................51, 60

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005) ................................................................................31

*Skeen v. Jo-Ann Stores, Inc.*,
750 A.2d 1170 (Del. 2000) ................................................................................45

*In re Smith*,
321 F. App'x 32 (2d Cir. 2009) .........................................................................27

*In re Taxman Clothing, Co.*,
905 F.2d 166 (7th Cir. 1990) ..............................................................23, 43, 55

*In re Taylor*,
599 F.3d 880 (9th Cir. 2010) .............................................................................54

*Thorpe ex rel. Castleman v. CERBCO, Inc.*,
676 A.2d 436 (Del. 1996) ............................................................................51, 61

*In re Trados Inc. S'holder Litig.*,
73 A.3d 17 (Del. Ch. 2013) .....................................................22, 37, 42, 48

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Trans World Airlines, Inc.*,
    134 F.3d 188 (3d Cir. 1998) ..............................................................43, 56

*Transcendence Transit II, Inc., et al.*,
    369 N.L.R.B. No. 101 (June 10, 2020) ...............................................18

*In re Trib. Co. Fraudulent Conv. Litig.*,
    2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ...........................................28

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...............................................33

*United States v. Everseoff*,
    528 F. App'x 75 (2d Cir. 2013) ...................................................26, 27

*United States v. McCombs*,
    30 F.3d 310 (2d Cir. 1994) .................................................................27

*United States v. Rivernider*,
    828 F.3d 91 (2d Cir. 2016) .................................................................31

*United States v. Tsurkan*,
    742 F. App'x 411 (11th Cir. 2018)......................................................35

*Valeant Pharms. Int'l v. Jerney*,
    921 A.2d 732 (Del. Ch. 2007) ..........................................................47

*In re Vision Hardware Grp., Inc.*,
    669 A.2d 671 (Del. Ch. 1995) ...........................................................43

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ................................... 22, 36, 42, 47, 48, 49

*In re XYZ Options, Inc.*,
    154 F.3d 1262 (11th Cir. 1998) ........................................................33

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Federal Statutes**

11 U.S.C. § 523(a)(2)(B) ...............................................................27

11 U.S.C. § 548(a)(1)(A) ................................................22, 26, 28

11 U.S.C. § 550(a) .........................................23, 52, 57, 58

11 U.S.C. § 550(d) ................................................................53

28 U.S.C. § 157(b) ...............................................................18

**State Statutes**

N.Y.D.C.L. § 276...............................................................22, 26, 28

N.Y.D.C.L. § 276-a ............................................................60

2019 N.Y. Sess. Laws Ch. 580 (A. 5622)..................................6

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ................................43

Collier on Bankruptcy (16th ed. 2021) ...................17, 28, 53, 58

    1 Collier on Bankruptcy ¶ 1.07........................................17

    5 Collier on Bankruptcy ¶ 548.04....................................28

    5 Collier on Bankruptcy ¶ 550.02..............................53, 58

**INTRODUCTION**

The bankruptcy and district courts awarded a $39.2 million windfall to an estate that had already received full compensation for the assets at issue. The liability judgments and the damages awards should be reversed.

TransCare Corporation and its debtor affiliates comprised an ambulance business that went into liquidation in late February 2016. For sixteen months before then, TransCare had been in a death spiral: Its operating income was insufficient to fund payroll and insurance obligations, while its working-capital lender—Wells Fargo, which had provided necessary financing for day-to-day operations—blocked funding needed to make payroll and ultimately refused to renew its loan facility beyond January 31, 2016. TransCare was required to repay its $13 million loan by then, which both courts below found was impossible. SA10; SA109.

Lynn Tilton, TransCare's director and the principal of its majority shareholder, kept TransCare afloat through early 2016 by working with Wells Fargo on funding plans and voluntarily providing millions of dollars through her investment vehicles despite having "no obligation to fund TransCare personally." SA43. Tilton repeatedly considered selling all or part of TransCare, but after consulting expert advisors she decided—in good faith, as both courts found, *see id.*; SA126—that a sale would not recover enough for creditors.

1

Once it was clear TransCare could neither continue nor be sold, Tilton developed a plan to restructure its potentially profitable business lines, repay outside lenders, and save hundreds of jobs. As both courts below agreed, the sole basis for the claims at issue was Tilton's attempt to execute that plan during a 20-day period in February 2016, when TransCare was indisputably and irrecoverably moribund and could not survive without additional funding, which was neither guaranteed nor forthcoming. Before that time, there was "no evidence that her decision[s] w[ere] tainted by any conflict or self-interest or … dictated by the goal to acquire the entire company or any part for her own benefit." SA43.

Tilton's plan never got off the ground, as Wells Fargo precipitated TransCare's bankruptcy filing and the Chapter 7 trustee ("Trustee") immediately blocked operation of the restructured business lines by denying access to needed computer servers. To maximize the estate's recovery, Tilton voluntarily turned over the restructured business lines' assets to the Trustee, who then promptly liquidated *all* the assets of TransCare under the bankruptcy court's supervision and used the proceeds to repay creditors. Because TransCare had no future in February 2016 and Chapter 7 liquidation was the only alternative to Tilton's plan to save jobs and repay creditors, the estate and creditors would have received the same amount (*i.e.*, the assets' liquidation value) regardless.

Tilton's efforts to salvage parts of TransCare, while unsuccessful, neither diminished the estate nor harmed its creditors by one cent. Nevertheless, the Trustee pursued two parallel liability theories against Tilton and entities she allegedly controlled.

First, the Trustee claimed the transfer of assets in the restructuring constituted an actual fraudulent conveyance. In endorsing this theory, the courts below erroneously considered only circumstantial evidence that Tilton *might* have had the requisite intent to hinder, delay, or defraud creditors, while ignoring direct evidence (and the Trustee's concession, *see* JA822-23(6:25-7:2)) that she *actually* lacked such intent. Second, the Trustee claimed Tilton breached her fiduciary duties to TransCare by pursuing restructuring when, the Trustee speculated, someone else might have paid significantly more for certain assets. But the Trustee failed to prove any such buyer existed in February 2016, and no rational buyer would have offered anything other than liquidation value at that late hour. Indeed, both courts accepted that "a sale of the entire TransCare was not feasible [then], due in large part to [its] rapidly deteriorating condition" and "immediate" need for "substantial … cash that was not readily available." SA43; *see* SA113.

The Trustee also pursued two parallel damages theories—both premised on valuing the restructured business lines as a "going concern" with future earning power. This was legal error because there was no going concern. TransCare had

3

long been in a death spiral, unable to meet its obligations.  While Tilton's financial assistance kept TransCare afloat as it lost valuable contracts and its assets deteriorated, TransCare ultimately filed for bankruptcy the same day as the restructuring transaction, and the Trustee himself affirmatively blocked the restructured business lines from operating; thus, only liquidation value was ever at stake.  No assets were physically removed from the estate, nor was their value impaired; instead, the Trustee liquidated everything and used the proceeds to benefit the estate and creditors.  Because liquidation in bankruptcy would have been inevitable without Tilton's plan, neither the transaction nor Tilton caused the estate harm.  In fact, Tilton herself lost most of her investment, and her equity became worthless.

At bottom, this lawsuit is the Trustee's effort to spin gold out of straw.  TransCare was on its deathbed and about to be liquidated in bankruptcy.  To avoid complete liquidation, Tilton attempted a rescue plan that she believed in good faith would benefit creditors and save jobs.  While that plan was unsuccessful, her actions neither caused the estate and creditors any harm, nor won herself or the other defendants any benefit.  There was no unlawful action here, much less any damages.

The judgments below should be reversed.

## STATEMENT OF JURISDICTION

These coordinated appeals concern two final judgments resolving a "core" bankruptcy claim of actual fraudulent conveyance and a "non-core" fiduciary-breach claim.

The bankruptcy court had jurisdiction under 28 U.S.C. § 157(b)-(c) and 28 U.S.C. § 1334(b) to enter judgment on the core claim and recommend a disposition on the non-core claim. The bankruptcy court issued its decision on both claims on July 6, 2020, SA1, and entered judgment on the core claim on July 15, 2020, SA101. Appellants timely appealed on the core claim, *see* JA109-10, and timely objected on the non-core claim, *see* JA120.

The district court had jurisdiction over the appeal under 28 U.S.C. § 158(a)(1) and the objections under 28 U.S.C. § 157(c)(1). Issuing its decision on both claims on September 29, 2021, SA103, the district court affirmed the judgment on the core claim, SA106, and, on October 6, 2021, entered judgment on the non-core claim, SA149. Appellants timely appealed both judgments to this Court on October 12, 2021, JA865; JA868, and the appeals were coordinated. An amended judgment was entered December 22, 2021. SA156.

This Court has jurisdiction under 28 U.S.C. § 158(d).

**ISSUES PRESENTED**

I.      Whether the courts below erred in concluding that the February 2016 transaction was either an actual fraudulent conveyance or a breach of fiduciary duty.

II.     Whether the courts below erred in awarding the Trustee $39.2 million in damages (plus interest and fees) under either liability theory.

**PERTINENT STATUTES**

The text of relevant statutes is set forth in the Special Appendix.[1]

**STATEMENT OF THE CASE**

These appeals arise from two final judgments of the Southern District of New York (Kaplan, J.) related to TransCare's Chapter 7 bankruptcy. Just before the bankruptcy petition was filed, Tilton sought to restructure the company by causing Patriarch Partners Agency Services, LLC ("PPAS") to foreclose on certain property and sell it to Transcendence Transit, Inc. and Transcendence Transit II, Inc. (together, "Transcendence"; with PPAS, "the Patriarch Entities"). The Trustee claimed that this transaction was an actual fraudulent conveyance and that Tilton breached her fiduciary duties to TransCare by effectuating it. The bankruptcy court held the Patriarch Entities liable for an actual fraudulent conveyance, SA72-76, and recommended holding Tilton liable for a fiduciary breach, SA41-54. The district court

---

[1]    All references to the New York Debtor & Creditor Law ("N.Y.D.C.L.") refer to the version in existence at the time of the transfer. That version has since been repealed. *See* 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney).

affirmed as to the Patriarch Entities, SA139-46, adopted the recommendation as to Tilton, SA120-31, and held them liable for, respectively, $39.2 million and $38.2 million in damages, SA131-39; SA146-47. They appeal the judgments as to both liability and damages.

## I. Factual Background

TransCare provided regional ambulance services to hospitals and municipalities, plus para-transit services to the New York Metropolitan Transit Authority under the "MTA contract." SA106. Tilton was TransCare's sole director and indirectly held 61% of its equity; Credit Suisse Alternative Capital, Inc. held or managed 26% of its equity; and various others held the remaining equity. SA106-07.

TransCare had two borrowings relevant here. The first was a revolving asset-based loan facility ("ABL") extended by Wells Fargo, SA6, that TransCare depended on to finance its day-to-day operations, including payroll, JA724(41:3-12). The second was the "Term Loan," governed by a secured-credit agreement between TransCare and the "Term Loan Lenders": (1) AIP, one of Tilton's personal investment vehicles; (2) the Zohar Funds, which Tilton owned and controlled but outside investors funded; (3) Credit Suisse; and (4) First Dominion Funding I. SA107 & nn.11-12. To call a default, only the "Required Lenders"—AIP and the Zohar Funds, whose aggregate credit exposure exceeded 50%—needed to consent. JA893; JA934-35. PPAS served as the Term Loan Lenders' administrative agent; Tilton

7

was PPAS's sole manager and indirect owner, and controller of Patriarch Partners, LLC ("Patriarch Partners"). SA107.

The ABL and Term Loan were secured by blanket liens on TransCare's assets. SA108. Under an intercreditor agreement, PPAS (as the Term Loan Lenders' agent) received a first-priority lien on TransCare's vehicles, certain other physical assets, capital stock of the subsidiaries, and intellectual property, while Wells Fargo received a first-priority lien on all other assets. JA1152-54(§§1.26, 1.35, 2.2).

## A. TransCare Experienced Significant Financial Distress

TransCare's financial troubles started in November 2014, when it began experiencing difficulty coming up with funds to pay employees and vendors, JA306; SA9, and maintaining current financials, JA462-63(79:21-80:12). Throughout 2015, TransCare was delayed in sending lenders monthly financial statements, JA306, and was "on life support," "depende[nt] on Tilton affiliates to cover shortfalls," *Ien v. TransCare Corp.*, 614 B.R. 187, 210 (Bankr. S.D.N.Y. 2020).

"[T]he beginning of the end for TransCare" came in July 2015. SA10. On July 2, Wells Fargo abruptly implemented a $1.5 million reserve requirement, effectively blocking the ABL funds TransCare needed to make payroll. JA724(41:3-16); JA1193. TransCare missed its payroll the next day, JA464-65(86:21-87:5); JA1193, and "never really recovered" its reputation with customers, JA725(42:4-14). Tilton negotiated a resolution with Wells Fargo to unblock the reserve, agreeing that Zohar

8

Funds would advance $2 million to TransCare. SA10. Zohar Funds continued to provide over $7.2 million in funding through January 2016 so TransCare could make payroll, pay creditors, and cover additional operational expenses. SA10 n.6; JA695(63:4-12); JA1829.

On October 14, 2015, Wells Fargo issued a notice of non-renewal, warning the ABL would expire January 31, 2016, and requiring TransCare to pay the outstanding balance (approximately $13 million) by then. SA10 n.7; JA605(159:19-22); JA2101. This was "[e]xtremely unlikely." JA468-69(93:6-94:4). As both courts found, TransCare's financial troubles left it "'in no position to' pay back" the loan. SA109 & n.17 (quoting SA10). To convince Wells Fargo to renew the ABL, Tilton and her team worked on a plan for increasing TransCare's revenue. SA10-11. But she concluded in mid-December 2015 that Wells Fargo would not renew the ABL unless TransCare began a sale process. SA14.

In 2015, after TransCare's financial distress became apparent, certain competitors expressed interest in acquiring some business lines, but none made actual offers. National Express expressed interest in TransCare's para-transit business, JA1661, and in July sent a non-binding letter of intent to purchase TransCare's MTA contract for $6-7 million and assume $2 million in liabilities, conditioned on satisfactory due diligence, JA1199-1208. American Medical Response inquired about

9

purchasing TransCare's Westchester operations.  SA12.  Only one competitor expressed potential interest in TransCare as a whole:  Richmond County Ambulance Service asked about purchasing all or part of TransCare in March, JA1658, and reiterated its inquiry in July, JA1660.  Although TransCare received additional "unsolicited calls" in December 2015, JA1312, there is no evidence these third parties continued to be interested in buying any part of TransCare in 2016.

As TransCare's director, Tilton evaluated, but did not pursue, these inquiries because no third party was willing to pay "a price that would have covered both Wells and the term loan lenders."  JA679-80(47:22-48:3); *see* JA680(48:8-16) (National Express's "true letter of intent" significantly reduced potential price); JA1192 (Richmond County offer "not likely to succeed" due to significant undervaluation). TransCare's lack of acceptable financial statements also would have hindered any due diligence.  JA680(48:14-16).  Tilton decided to "let Trans[C]are make its way back to normalized EBITDA [earnings before interest, taxes, depreciation, and amortization]," JA2093, so that any sale proceeds would be sufficient to repay creditors, JA679-80(47:22-48:3).  Both courts below found the foregoing actions were all appropriate business judgments.  *See* SA42-43; SA123-31.

### B.    Tilton Considered Various Options to Save TransCare

Tilton began exploring a potential sale in December 2015, SA109, when TransCare faced "immediate liquidity challenges" and was behind on payroll taxes

10

by $1.2 million, JA1664. Tilton envisioned a sale would take six months. JA399(54:20-22). Wells Fargo welcomed a sale, but worried TransCare was "nearing the boiling point." JA1664. Wells Fargo subsequently proposed terms for a longer-term forbearance on the amount due under the ABL, including engaging a third-party financial advisor, preparing a budget for TransCare, and closing in mid-August 2016, JA307; JA1317; JA1326—but only if Tilton agreed to provide yet more funding through Patriarch Partners to cover TransCare's "critical operating expenses," JA1318.

In early January 2016, per Wells Fargo's terms, TransCare retained Carl Marks Advisory Group LLC ("CMAG") as "chief restructuring officer and [interim] CFO," JA684(52:1-2), "to stabilize the company and prepare it for a sale," JA410(77:13-19); *see* JA275-76(99:12-100:8); JA2111. Tilton promptly shared with CMAG a TransCare budget intended to "support a sale process and minimize capital needed." JA1331; *see* JA410(77:4-9). On January 14, CMAG informed Tilton "substantial" funding—from Tilton personally, as "there was no place else to get any money," JA733-34(69:15-70:2)—was "absolutely necessary in order to keep the business as an ongoing enterprise," as TransCare's cash flow barely covered payroll and payroll tax, vendors were refusing work, and insurers had all issued cancellation notices, JA1670.

11

Alarmed, Tilton explained that she did "not want to keep funding into a black hole that cannot be filled"—a concern CMAG shared. JA1668-69. She worried further cash injections would be "constant stop gap measure[s] without a plan … dr[iving] the future." JA1669. Despite these misgivings, the next day Tilton caused her investment vehicle Ark II to wire $1.1 million to address the insurers' cancellation notices and keep TransCare afloat. SA18; JA2120-21. Michael Greenberg, a Patriarch Partners credit officer, then negotiated with Wells Fargo a plan whereby Ark II would extend TransCare a credit facility of up to $6.5 million, secured by a lien junior to Wells Fargo's liens. JA1672.

On January 27, 2016, CMAG warned that TransCare was "operating at an absolute breaking point": The ambulance fleet and relations with customers, vendors, and landlords were all "[s]trained and [b]roken"; and TransCare was rapidly losing customers, struggling to make payroll, and facing evictions in multiple facilities. JA1681-82. CMAG proposed that, for TransCare to "have a chance of a turnaround," Tilton needed to immediately pledge over $7.5 million—including $3.5 million within two weeks. JA1684. This would be a "high" "risk" investment with "uncertain" return, but the alternative of Chapter 11 bankruptcy was not recommended as it would still require paying many outstanding expenses. JA1684-86.

Tilton weighed, but declined to approve, the full funding request. JA734-35(70:24-71:5). Neither she nor Patriarch Partners had any legal obligation to fund

12

TransCare, SA43, and Tilton was concerned about "more black hole funding"—"seven and a half million dollars just to survive to try to get a plan together," JA735(71:1-3). She nevertheless continued funding TransCare, including $180,000 to purchase two new ambulances, JA2122, and $690,000 for insurance payments so TransCare could "live another day," JA690-91(58:21-59:15); JA2125.

By February 2, 2016, TransCare's "cash situation [wa]s dire and not improving," JA1713, and TransCare "could not continue operations without a significant infusion of cash," JA1711. Teetering on the edge of collapse, TransCare depended on day-to-day funding from Wells Fargo—which Wells Fargo likewise had no obligation to provide. *See* JA2202. Each day it was uncertain whether TransCare would survive to see the next. *See* JA690-91(58:21-59:15); JA2202.

By February 5, 2016, TransCare was in default, SA112; owed approximately $14 million to Wells Fargo and $45 million to the Term Loan Lenders, *see* JA1628; JA1666-67; JA1822; faced "very public" "rumors" about missing payroll, JA725(42:4-14); and had no agreement about a new working-capital facility to replace Wells Fargo's, no ability to make payroll or meet other critical obligations, and no funding readily available, JA423(8:17-22); JA1710.

Faced with the company's rapid deterioration, inability to provide accurate financial statements, and lack of time for third-party due diligence, Tilton concluded that TransCare "as a whole was not saleable." SA43.

13

### C. Tilton Developed the Restructuring Plan

Around February 5, 2016, Tilton began working with Wells Fargo, CMAG, and TransCare executives on a plan "to save some of our company and our people." JA1463; *see* JA696(64:1-16). The only realistic alternative to this "Restructuring Plan" was liquidation of TransCare's assets. JA740(79:1-10).

Tilton undisputedly developed the Restructuring Plan with "an honest intention" to benefit all creditors. JA822-23(6:22-7:2) (Trustee concession). Tilton's testimony on this point was uncontroverted. *See* JA739(78:21-25) ("we wanted it to not be just for Wells' benefit"); JA748(87:13-16) ("we were … [trying] to collect as much as possible not only for Wells, but also for the remaining term lenders"); *see also*, *e.g.*, JA739(78:2-14); JA741(80:15-17); JA773(119:2-6); JA781(127:5-16). And contemporaneous documents reflected her intent to benefit all creditors. *See*, *e.g.*, JA1463 (plan "will make [Wells Fargo's] recovery better"); JA1467 (plan was "a win/win" that would "increase the likelihood of collectability of receivables"); JA1468 ("We are trying to … pay [Wells Fargo] cash").

As the Restructuring Plan developed, Tilton kept required stakeholders and CMAG informed. She first described the plan to Wells Fargo on February 9, JA2128, and continued to refine it based on input from Wells Fargo, its outside counsel, CMAG, TransCare executives, and TransCare's outside counsel, *see*, *e.g.*,

14

JA1447; JA1820; JA1846-47; JA2128; JA2197; JA2200; JA2206. Tilton shared financial models with Wells Fargo "daily." JA699(67:13-16).

The Restructuring Plan involved splitting TransCare into "OldCo" and "NewCo" via the following "Transaction." PPAS, as the Term Loan Lenders' agent, would foreclose on the collateral secured by their liens ("Subject Collateral") as partial satisfaction of $10 million of their outstanding loans, SA21, and then transfer that property to NewCo (called Transcendence) to operate certain TransCare business lines using $12 million provided by Tilton's investment vehicles, SA54; JA652(13:6-23). In exchange for the Subject Collateral, the Term Loan Lenders would receive over 45% of Transcendence and thereby have "the best opportunity" at recovery should Transcendence succeed. JA770-73(116:5-119:19) (discussing JA1820); *see* SA117; JA647-48(8:22-9:7); JA665(33:14-18); JA676(44:14-17); JA778-79(124:25-125:7). This "*pro rata*" equity allocation, JA772(118:6-20), was consistent with the Term Loan agreement, *see* JA945(§12.7(a)) (proceeds must be allocated "ratably"). In addition, Transcendence would assume millions of dollars in trade payables, JA1833, and "save 700 jobs" from TransCare, JA1468.

Meanwhile, the balance of TransCare, called OldCo, would wind down within 60-90 days—enough time to collect accounts receivable for Wells Fargo and notify employees and customers—and enter bankruptcy. JA697(65:3-16). Wells Fargo

15

was willing to partially fund this orderly wind-down only if Tilton partially funded TransCare. SA43.

While Tilton and her team finalized the Restructuring Plan, TransCare "was in a free fall." JA658(23:4-6). In February 2016, three hospitals cancelled contracts intended to go to Transcendence. JA2203; JA761(100:11-14). This was "a big hit" to the Restructuring Plan. JA760(99:14-20). Wells Fargo also told Tilton it was ceasing funding, which would have triggered immediate bankruptcy. JA755-56(94:23-95:2); JA1443. Although this decision was quickly reversed, JA756(95:3-11), TransCare continued to exist day-to-day at Wells Fargo's mercy.

### D. The Patriarch Entities Executed the Restructuring Plan

On February 24, PPAS and Transcendence executed the two-step Transaction. First, the Required Lenders and PPAS declared an event of default under the Term Loan, accelerating TransCare's loan obligations to come due immediately. JA1480-83. As satisfaction of $10 million of TransCare's outstanding loan balance, PPAS accepted the Subject Collateral, which included all of TransCare's personal property, three contracts (including the MTA contract), and the stock of three TransCare entities. JA1475-79. The $10 million figure reflected detailed calculations based on the property's book value, assuming Transcendence would operate five divisions and Tilton would purchase TransCare's accounts receivable from Wells Fargo (which had a lien on them). SA118.

16

Second, PPAS completed the Transaction by selling the Subject Collateral to Transcendence for a $10 million equity stake in Transcendence.  JA1602; JA770-73(116:5-119:19).  By that point, the Subject Collateral's actual book value was less than $1 million, as Transcendence ended up with only three operating divisions and the accounts receivable were not actually purchased.  SA118.

### E.    After TransCare Filed for Bankruptcy, the Trustee Prevented Transcendence from Operating and Repaying Creditors

Even though the Transaction was intended to repay creditors, Wells Fargo told Tilton on February 24 it would not fund the planned wind-down unless TransCare entered Chapter 7 bankruptcy.  JA709-10(77:21-78:4).  All OldCo assets would be liquidated to repay creditors, and OldCo business lines would cease operations; unlike with Chapter 11 bankruptcy, there would be no debt reorganization.  *See* 1 Collier on Bankruptcy ¶¶ 1.07[1], [3] (16th ed. 2021).

On February 24, TransCare and its OldCo subsidiaries filed for Chapter 7 bankruptcy, JA308-09, and Plaintiff-Appellant was appointed trustee, JA309.  The Trustee immediately prevented Transcendence from becoming operational:  He blocked Transcendence from accessing a computer server (still on TransCare's premises) that Transcendence needed to operate, JA610-11(165:23-166:4); JA661(26:6-9); JA1479; denied PPAS access to TransCare's systems so that Transcendence could not issue payroll checks, JA601(148:22-25); and contested ownership of the Subject Collateral, thereby "prevent[ing] [Transcendence's] ability

17

to operate," JA1863.  As a result of the Trustee's actions, Transcendence "was in fact not operating at any given time."  *Transcendence Transit II, Inc., et al.*, 369 N.L.R.B. No. 101 (June 10, 2020).

To maximize creditors' recovery, Tilton, PPAS, and Transcendence voluntarily agreed to transfer the Subject Collateral to the Trustee "free and clear" of any encumbrance.  JA1894.  The Trustee liquidated the Subject Collateral and TransCare's remaining assets in a robust sales process pursuant to court-approved procedures.  *See* JA168.  He recovered for the estate approximately $19.2 million (net), JA555(13:10-14), including $1.2 million for the Subject Collateral, SA67.  The auction proceeds covered the approximately $13 million TransCare owed to Wells Fargo.  JA605(159:16-24).  Tilton's various entities collectively recovered only a small fraction of their claims.  *See* SA37.

## II. Procedural History

In February 2018, the Trustee filed this lawsuit, claiming that the Patriarch Entities' foreclosure on the Subject Collateral was an actual fraudulent conveyance and that Tilton breached her fiduciary duties to TransCare by executing the Restructuring Plan.  SA105-06.  The bankruptcy court could fully adjudicate the former claim, but only recommend a disposition on the latter.  *See* 28 U.S.C. § 157(b).  (The remaining claims were unsuccessful or are irrelevant here.)

18

**A.** In July 2020, the bankruptcy court ruled on both claims after a bench trial. SA1. The court recognized that, from November 2014 until February 2016, Trans-Care faced considerable financial difficulties and was unable to meet critical obligations. SA9-10. The court also narrowed the claims to the twenty-day period from February 5, 2016, when Tilton began developing the Restructuring Plan, to February 24, when she executed it. SA42-43. Tilton's many key business decisions before then—including evaluating third-party inquiries into TransCare's business lines, attempting to negotiate an ABL extension, retaining CMAG, and determining TransCare was not saleable as a whole—were deemed informed, made in good faith, and hence protected business judgments. SA10-21; SA42-43.

The bankruptcy court nevertheless held that the Patriarch Entities had effec-tuated an actual fraudulent conveyance. SA76. Imputing Tilton's intent to the entities, the court concluded Tilton had the requisite intent based on certain external indicia associated with fraud, *id.*, even though her actual intent was undisputedly to benefit creditors and save jobs, *see* JA822-23(6:25-7:2).

The bankruptcy court recommended holding Tilton liable for a fiduciary breach because the Transaction was not "entire[ly] fair[]" under Delaware law. SA54. In assessing whether there was fair dealing, the court considered only Tilton's actions from February 5, 2016, onward and not her many earlier decisions about saving TransCare. *Id.* In assessing whether the price was fair, the court used

the Subject Collateral's purported going-concern value, *id.—i.e.*, its value if given reasonable time to find a buyer while continuing to operate—even though TransCare faced imminent collapse and the Trustee prevented Transcendence from ever operating.

The bankruptcy court entered a $39.2 million judgment against the Patriarch Entities (plus interest and attorneys' fees), SA79-80; SA101, based on valuing the Subject Collateral as a going concern, SA76. This figure relied on calculations by the Trustee's expert, who multiplied Transcendence's projected $4 million EBITDA value (which assumed $10 million of new capital) by a 10.1x going-concern multiplier, the mean of four companies he used as market comparisons. SA76-79. The court also recommended a $41.8 million judgment against Tilton—similarly calculated but using a higher going-concern multiplier. SA63; SA76-79. Because the two claims remedied the same injury, the court ruled only a single satisfaction was proper. SA79.

**B.** In the district court, the Patriarch Entities appealed from the final judgment, and Tilton objected to the recommended judgment.

The district court affirmed as to the actual-fraudulent-conveyance claim, finding no clear error in the bankruptcy court's analysis. SA146. Like the bankruptcy court, the district court focused on supposed "badges of fraud"—*e.g.*, Tilton stood on both sides of the Transaction and did not inform unaffiliated creditors—and ruled

it was "of no matter" that the bankruptcy court had ignored undisputed evidence of Tilton's innocent intent because her testimony was "self-serving." SA143-44 & n.150.

On the fiduciary-breach claim, the district court held that Tilton satisfied neither the "fair price" nor "fair dealing" aspects of the "entire fairness" inquiry. SA126-29. The court's "biggest issue" with fair price was that the $10 million purchase price was not based on the Subject Collateral's going-concern value. SA128-29. The court deemed the dealing unfair primarily because Tilton never tried to sell supposedly "less risky" TransCare lines in February 2016. SA126.

The district court also affirmed the $39.2 million judgment against the Patriarch Entities, SA147, concluding the proper damages measure was the Subject Collateral's "going concern value," SA133. The court slightly modified the damages against Tilton to $38.2 million, however, deeming the use of a higher multiplier speculative. SA131. The court likewise held the Trustee could obtain only a single satisfaction. SA148.

Timely appeals from both judgments were coordinated before this Court.

21

## SUMMARY OF ARGUMENT

This Court should reverse both judgments below; at minimum, it should vacate both damages awards.

**I.** The Trustee failed to prove there was an actual fraudulent conveyance or breach of fiduciary duties.

**A.** The Trustee failed to prove by clear and convincing evidence that Tilton had the requisite *actual* intent to "hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A); N.Y.D.C.L. § 276. As he himself conceded, Tilton had "an honest intention." JA822-23(6:25-7:2). It was legal error for the courts below to rely solely on circumstantial evidence of the appearance of fraud, when all direct evidence showed she actually had an innocent intent and communicated her plans to all required stakeholders. *See*, *e.g.*, *Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000); *In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992).

**B.** Tilton carried her burden to prove the Transaction was "entire[ly] fair[]" under Delaware law. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). She showed that TransCare had "no future," there was "no better alternative" to the Restructuring Plan, and the Subject Collateral's $10 million price was "fair." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 76 (Del. Ch. 2013). The district court's contrary conclusion assumed the Subject Collateral had going-concern value, meaning there was a buyer willing to pay many multiples of its book value. But the

22

evidence contradicts that assumption. TransCare was on its deathbed and, to avoid liquidation, needed substantial cash infusions that no one was willing or required to provide. Its assets were worth no more than their liquidation value.

**II.** Even if this Court were to affirm the liability rulings, it should vacate the damages awards because the Trustee failed to prove any actual damages.

**A.** The Trustee is statutorily entitled to "the property transferred, *or* … the value of such property," 11 U.S.C. § 550(a) (emphasis added), but impermissibly recovered *both* by receiving and selling the Subject Collateral to garner the "maximum benefit available," JA140, and then suing for damages. Moreover, the courts below committed legal error in measuring damages using going-concern value, when TransCare was on its deathbed and the Trustee prevented Transcendence from operating as a going concern. *See In re Mama D'Angelo, Inc.*, 55 F.3d 552, 555 (10th Cir. 1995); *In re Taxman Clothing, Co.*, 905 F.2d 166, 170 (7th Cir. 1990).

**B.** Because TransCare would have gone bankrupt and had its assets liquidated even without the Restructuring Plan, Tilton's actions caused the estate no harm. While the district court faulted Tilton for "provid[ing] no evidence" that no third party would buy the Subject Collateral, SA127, it was the Trustee's burden to identify a willing buyer, and he failed to do so. Once again, it was legal error to use going-concern value to measure damages.

23

## STANDARD OF REVIEW

"This Court exercises plenary review over the decisions of the district court and bankruptcy court," *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 139 (2d Cir. 2005), including a "district court's affirmation of a bankruptcy court's judgment," *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004). Legal conclusions, including the application of law to fact, are reviewed *de novo*; factual findings for clear error. *Id.*; *see also infra* 27 & n.2.

While the fiduciary-breach claim is governed by the law of Delaware, where TransCare is incorporated, *see Hausman v. Buckley*, 299 F.2d 696, 702 (2d Cir. 1962), the actual-fraudulent-conveyance claim was brought under New York and federal statutes, as it concerns actions occurring in New York.

"'Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law'" reviewed *de novo*. *32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 98 (2d Cir. 2019) (citation omitted); *accord Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 379 (2d Cir. 2002).

## ARGUMENT

It is undisputed that TransCare was on the verge of collapse, that Tilton spent months carefully weighing all options, that she developed her plan to save some business lines in good faith, and that her plan, had it succeeded, would have provided

creditors substantially more upside than the Trustee recovered for those same assets. While Tilton's plan was unsuccessful, it did not diminish the estate's value or creditors' recovery, as the Subject Collateral and all other assets were liquidated for the estate's benefit. The courts below assumed some white knight would have paid going-concern value in February 2016 for the businesses Tilton tried to salvage. But there is zero evidence that any such buyer existed (even with CMAG's help in finding one) or that TransCare could have survived long enough to see any sale consummated. Moreover, the Trustee prevented any going-concern value by affirmatively blocking Transcendence from getting off the ground.

The Trustee's liability theories do not withstand scrutiny, and his attempt to recover $39.2 million in windfall damages (plus interest and fees) for assets that brought the estate only $1.2 million is beyond the pale. The judgments below should be reversed; at minimum, this Court should vacate the damages awards.

## I.    The Transaction Was Not Unlawful

The Trustee asserted two parallel liability theories, alleging that the Patriarch Entities engaged in an actual fraudulent conveyance when PPAS foreclosed on the Subject Collateral and transferred it to Transcendence, and that Tilton breached her fiduciary duties by effectuating the Transaction instead of finding a third party to buy TransCare's business lines. Both theories fail as a matter of law.

## A. The Transaction Was Not an Actual Fraudulent Conveyance

The Trustee claimed the Transaction was an actual fraudulent conveyance under New York and federal law because it allegedly was made with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A); N.Y.D.C.L. § 276. Crucially, the actual-intent requirement for these claims is "distinguished from intent presumed in law," N.Y.D.C.L. § 276, and "must be proven by clear and convincing evidence," *United States v. Everoff*, 528 F. App'x 75, 78 (2d Cir. 2013) (summary order); *accord HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995). The Trustee failed to meet this demanding standard because, as he conceded after the close of evidence, Tilton's subjective intent—which is imputed to the Patriarch Entities, *see In re Lyondell Chem. Co.*, 554 B.R. 635, 647 (S.D.N.Y. 2016); *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010)—reflected "an honest intention" to save jobs and benefit creditors, not defraud them, JA822-23(6:25-7:2).

Instead of assessing Tilton's actual, *subjective* intent, the courts below focused solely on *objective* "badges of fraud." SA74-76; SA144-46. That was legal error for two reasons. Although badges of fraud may be used as indicia of the requisite intent, any evidence of subjective intent still must be considered, and neither court did that. Moreover, both courts ignored that where badges of fraud are considered, "'significantly clear' evidence of a legitimate supervening purpose" overcomes any inference of actual fraudulent intent. *Max Sugarman Funeral Home,*

26

*Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254-55 (1st Cir. 1991) (citation omitted). The uncontroverted evidence of Tilton's honest intentions, in short, forecloses any inference that she actually intended to hinder, delay, or defraud.

Although the judgment cannot withstand any standard of review, the actual-intent issue is reviewed *de novo*. The law is clear: "While the issue of intent is normally a question of fact," an actual-fraudulent-intent determination is reviewed "*de novo* as an issue involving the application of law to fact." *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994); *see Everoff*, 528 F. App'x at 77 ("We review *de novo* the district court's determination that [the] transfers … were actually fraudulent"); *Cadle Co. v. Newhouse*, 20 F. App'x 69, 72, 75 (2d Cir. 2001) (summary order) (reviewing actual-fraudulent-intent determination *de novo*).[2]

### 1. Tilton's Subjective Intent Was to Benefit Creditors

An actual-fraudulent-conveyance claim focuses on a debtor's subjective intent. Tilton had "an honest intention," as the Trustee admitted, JA822-23(6:25-7:2), and even kept Wells Fargo and all necessary lenders informed. There is no evidence she subjectively intended to hinder, delay, or defraud creditors.

---

[2] The district court erroneously applied a clear-error standard. *See* SA140 & n.134. It cited no cases applying New York law; and it relied solely on an unpublished summary order that wrongly imputed to the actual-fraudulent-conveyance context the intent-to-deceive standard under a different statute. *See In re Smith*, 321 F. App'x 32, 32 (2d Cir. 2009) (summary order) (citing *In re Bonnanzio*, 91 F.3d 296 (2d Cir. 1996) (applying 11 U.S.C. § 523(a)(2)(B))).

It is well established that the debtor's subjective intent is the key inquiry here. *See* 5 Collier on Bankruptcy ¶ 548.04 ("The statutory text focuses on the debtor's intent"); *see also* 11 U.S.C. § 548(a)(1)(A) (requiring "actual intent to hinder, delay, or defraud"); N.Y.D.C.L. § 276 (requiring "actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud"). Whereas liability for a *constructive* fraudulent conveyance "may be imposed without regard to intent," *In re Trib. Co. Fraudulent Conv. Litig.*, 2017 WL 82391, at *15 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F.4th 147 (2d Cir. 2021), the Trustee's claim for an *actual* fraudulent conveyance "requires proof of that added element, his mental apprehension of [the] consequences [of his conduct]," *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) (Hand, J.); *see*, *e.g.*, *In re Lyondell Chem. Co.*, 567 B.R. 55, 116 (Bankr. S.D.N.Y. 2017) (subjective-intent requirement "remains applicable"), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018).

There is *no evidence* Tilton subjectively intended to hinder, delay, or defraud creditors. The Trustee's counsel conceded as much when asked directly for such evidence, stating: "I don't know that we would say that [Tilton] wasn't acting with an honest intention to reorganize or save [TransCare]." JA822-23(6:25-7:2). This concession alone warrants reversal.

Indeed, the uncontroverted trial evidence was that Tilton actually intended to *benefit* all creditors. Tilton herself repeatedly testified as much. *See* JA739(78:21-

28

25) ("we wanted it to not be just for Wells' benefit"); JA748(87:13-16) ("we were … [trying] to collect as much as possible not only for Wells, but also for the remaining term lenders"); JA772-73(118:23-119:5) (Restructuring Plan "was our best hope at collecting for the loans"); *see also*, *e.g.*, JA739(78:2-4) (trying "to get Wells out at par"); JA741(80:15-17) (including "OldCo wind-down model" so Wells Fargo "would fully recover their money"). That testimony—which the bankruptcy court found credible, *see* SA43; SA71—goes directly to Tilton's honest intent.

Contemporaneous evidence confirms Tilton acted in good faith. She constantly communicated with one of TransCare's largest creditors (Wells Fargo) and CMAG. *See* JA699(67:13-16) ("daily" discussions); JA1447; JA1846-47; JA2197. Tilton's extensive correspondence with Wells Fargo repeatedly stated her intent to save jobs and repay creditors. *See*, *e.g.*, JA1467-68 (aiming to "save 700 jobs and pay [Wells Fargo] cash," "a win/win" that would "increase the likelihood of collectability of receivables"); JA1463 ("We are also working here to save some of our company and our people. That will make [Wells Fargo's] recovery better").

The Transaction's circumstances and terms further confirm it was legitimately the best option for creditors. In 2015, Tilton decided after reviewing all expressions of interest that nobody was willing to pay "a price that would have covered both Wells and the term loan lenders." JA679-80(47:22-48:3); *see* JA680(48:8-16) (National Express's "true letter of intent" significantly reduced potential offer price);

29

JA1192 (Richmond County offer "not likely to succeed" due to significant under-valuation). Both courts below found Tilton made those decisions in "good faith." SA43; SA126.

Tilton's Restructuring Plan was designed to repay Wells Fargo through OldCo, *see* JA741(80:15-17), and give the Term Loan Lenders at least 45% of Transcendence's equity—their "best opportunity" at future recovery, given TransCare's insolvency, JA770-73(116:5-119:19); *see* JA665(33:14-18); JA676(44:14-17); JA741(80:15-17); JA778-79(124:25-125:7). That plan further called for "sav[ing] 700 jobs" from TransCare. JA1468. The only alternative—liquidation—ultimately saved no jobs and recovered nothing for the Term Loan Lenders.

The district court's skepticism of the planned equity allocation, *see* SA117, is unfounded. As the Trustee admits, "contemporaneous evidence" confirmed the Term Loan Lenders would actually receive more than 45% of Transcendence. JA863-64 (discussing JA1820). This "*pro rata*" equity allocation, JA772(118:6-20), was, in fact, required under the Term Loan agreement, *see* JA945(§12.7(a)) (proceeds must be allocated "ratably"). The shares never issued because Transcendence never became operational. JA516(25:13-14) ("It just fell apart").

The Trustee thus utterly failed to prove the requisite intent by clear and convincing evidence.

### 2. The Courts Below Erred by Ignoring Tilton's Subjective Intent

The courts below ignored Tilton's actual, subjective intent and, instead, conducted an objective inquiry based solely upon so-called "badges of fraud." SA74-76; SA144-46. It was legal error both to ignore the evidence of Tilton's subjective intent and to consider badges of fraud without also considering whether Tilton had a legitimate supervening purpose for executing the conveyance.

**a.** It was legal error not to consider *any* evidence of Tilton's subjective intent because "a showing of intent grounded in an objective standard is insufficient." *Lyondell*, 567 B.R. at 116; *cf. United States v. Rivernider*, 828 F.3d 91, 104 (2d Cir. 2016) (emphasizing defendants must "'*contemplate*'" the harm to possess requisite intent for wire fraud (alteration and citation omitted)).

In assessing actual intent, courts sometimes rely on objective circumstances commonly associated with actual fraudulent conveyances, called "badges of fraud." *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). But any actual-intent finding still "requires a subjective evaluation of the debtor's motive." *Jeffrey Bigelow*, 956 F.2d at 484; *see McCord v. Ally Fin., Inc.*, 559 B.R. 41, 62 (Bankr. E.D.N.Y. 2016) (cabining badges of fraud to avoid undermining subjective nature of inquiry). That is because "a 'badge of fraud' is not the same as a finding of fraud," but "'only evidence of the *likelihood* of fraud.'" *In re Khan*, 2014 WL 10474969, at *25

(E.D.N.Y. Dec. 24, 2014) (emphasis added; citation omitted).  Where courts con-sider badges of fraud, therefore, those objective indicia must be "viewed in the context of all of the facts and circumstances," including "'any probative evidence of innocent intent.'"  *McCord*, 559 B.R. at 62 (citation omitted).

By looking to only badges of fraud—without also weighing the overwhelming evidence of Tilton's innocent intent—both courts considered only whether the Transaction *resembled* a fraudulent conveyance, without asking the relevant ques-tion whether it was *actually* intended to delay, hinder, or defraud.

**b.**  Even had it been proper to consider badges of fraud without also assessing evidence of Tilton's good faith, the lower courts further erred by cherry-picking in-dicia of the appearance of fraud while ignoring that Tilton's actions manifestly had a legitimate purpose.

**i.**  Every Circuit to have considered badges of fraud in an actual-fraudulent-conveyance case has undertaken a two-step inquiry.  First, the trustee may create a presumption of fraudulent intent by establishing badges of fraud.  *Kelly*, 206 F.3d at 798.  Second, the debtor can rebut that presumption by proving the transfer had a legitimate supervening purpose.  *Id.*  This two-step inquiry has been adopted by the First, Eighth, Ninth, and Eleventh Circuits, and applied by the Fifth Circuit under parallel Georgia law.  *See Max Sugarman*, 926 F.2d at 1254-55 (1st Cir.); *Duncan v. First Nat'l Bank of Cartersville*, 597 F.2d 51, 56 (5th Cir. 1979); *Kelly*, 206 F.3d

at 798 (8th Cir.); *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994); *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998).

Although this Court has not yet considered the question, it should follow the consensus approach. The legitimate-supervening-purpose test matters in precisely this kind of case, where a court might otherwise examine the record and pick out superficial indicators of fraud in transfers that nevertheless involve good faith. *See*, *e.g.*, *In re Eubanks*, 444 B.R. 415, 425 (Bankr. E.D. Ark. 2010) (notwithstanding badges of fraud, debtor's testimony was "an honest statement of his perception of the situation"); *In re Earle*, 307 B.R. 276, 296 (Bankr. S.D. Ala. 2002) ("A transfer may frustrate and/or incidentally affect a creditor, but that is not enough to prove fraud, particularly where there is a legitimate reason proven for the transfer").

As courts in this Circuit have recognized, the legitimate-supervening-purpose test aligns with the subjective nature of the actual-intent requirement and provides an important check on badges of fraud. *See*, *e.g.*, *In re Tronox Inc.*, 503 B.R. 239, 284 (Bankr. S.D.N.Y. 2013). Without explicitly considering whether the defendant actually had a legitimate purpose, courts risk ascribing subjective fraudulent intent based merely on appearances divorced from a transaction's larger context. *See*, *e.g.*, *In re Chin*, 492 B.R. 117, 131 (Bankr. E.D.N.Y. 2013) (emphasizing importance of the "context of the case and any probative evidence of innocent intent").

**ii.** The Patriarch Entities unquestionably proved Tilton had a legitimate supervening purpose in effectuating the Transaction.

The uncontroverted record shows that Tilton intended the conveyance to benefit creditors and save jobs.  In other contexts, the bankruptcy court found Tilton's stated beliefs and intentions credible.  *See* SA43 (crediting Tilton's "good faith determination that [TransCare] as a whole was not saleable"); SA71 (crediting Tilton's belief that TransCare could comply with certain requirements).  Yet the court wholly ignored the same uncontroverted evidence in the actual-fraudulent-conveyance context.  In one conclusory sentence with no analysis, it stated there was no "'significantly clear evidence of a legitimate supervening purpose' to effectuate [the] transfer."  SA76 (citation omitted).  In light of the overwhelming evidence to the contrary (and the Trustee's concession that Tilton had an honest intention), that summary determination cannot withstand any standard of review.

The district court compounded this error, holding that "Tilton's stated desire … to save jobs *does not preclude the finding* that she nevertheless intended also to hinder or delay … creditors."  SA145 (emphasis added); *see* SA144 (finding no error "in *discounting* this evidence [of Tilton's legitimate purpose] in light of" evidence of badges of fraud (emphasis added)).  That is precisely backwards: Tilton's legitimate purpose *conclusively rebuts* any presumption of actual fraudulent intent created

34

by any badges of fraud.  *See*, *e.g.*, *Kelly*, 206 F.3d at 798; *Max Sugarman*, 926 F.2d at 1254-55.

The district court also deemed Tilton's testimony "of no matter" because it was "necessarily self-serving."  SA144 n.150.  But that sworn testimony—which was found credible and corroborated by contemporary documents—was the *only* direct evidence of Tilton's subjective intent and proved she actually intended to benefit creditors (which is why she kept Wells Fargo informed).  It was legal error to treat circumstantial evidence of badges of fraud as creating a presumption that no direct evidence could rebut.  *See*, *e.g.*, *United States v. Tsurkan*, 742 F. App'x 411, 414 (11th Cir. 2018) (unpublished) (exclusion of defendant's testimony on relevant collateral issue was error where "intent was the only issue in th[e] case"); *Eubanks*, 444 B.R. at 424-25 (defendant's "self-serving" testimony about his own intent overcame badges of fraud); *In re Kenney*, 2020 WL 2311876, at *2 (Bankr. D.N.J. May 8, 2020) (similar).  By discounting Tilton's corroborated testimony about her own actual intent when the dispositive issue was her own actual intent, the courts below effectively denied the Patriarch Entities any ability to defeat the claim against them.

Accordingly, the judgment against the Patriarch Entities should be reversed.

## B.    Tilton Did Not Breach Her Fiduciary Duties to TransCare

As both courts below recognized, the Trustee's fiduciary-breach claim against Tilton is narrow, spanning just twenty days between February 5 and February 24,

2016. *See* SA42-43; SA123-31. For the remaining sixteen-month period when TransCare faced financial difficulties, the business-judgment rule protects Tilton's myriad decisions, from evaluating third-party inquiries to negotiating for an ABL extension and determining TransCare as a whole was not saleable. *Id.*

The sole remaining liability issue, then, is whether Tilton's enactment of the Restructuring Plan breached her fiduciary duties. It did not. Even in February 2016, Tilton did not "tilt the playing field," as the bankruptcy court erroneously ruled. SA48. To the contrary, she had already retained CMAG as TransCare's interim CFO "to stabilize the company and prepare it for a [third-party] sale." JA410(77:18). When neither Tilton nor CMAG found a buyer, Tilton arranged the Restructuring Plan to maximize the benefit to TransCare's creditors—giving the Term Loan Lenders over 45% of Transcendence's equity consistent with the Term Loan agreement, JA1823, ensuring TransCare could satisfy its obligations to Wells Fargo during OldCo's wind-down, JA741(80:15-17), pricing the Subject Collateral at (or above) book value, and assuming millions of dollars in trade payables, JA1833. Tilton's plan was entirely fair; there was no fiduciary breach.

### 1. Fair Price Alone Satisfies the Entire-Fairness Standard

Because Tilton stood on both sides of the Transaction, the entire-fairness standard applies here, *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983), under which the defendant normally must prove the transaction "'was the product of

both fair dealing *and* fair price,'" *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted). "The fair price aspect," however, "can be 'the predominant consideration in the unitary entire fairness inquiry,'" as it is here. *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *27 (Del. Ch. July 21, 2017) (citation omitted).

Specifically, when a business has "'no future'" and the defendant shows there was "'no better alternative,'" fair price alone establishes entire fairness. *Trados*, 73 A.3d at 76 (quoting *Blackmore Partners, L.P. v. Link Energy LLC*, 864 A.2d 80, 86 (Del. Ch. 2004)); *accord Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *26 (Del. Ch. May 27, 2015). Although the bankruptcy court thought *Trados* distinguishable because these two factual predicates were not met there, *see* SA47 n.21, *Trados* (like *Blackmore* and *Cancan*) still provides the relevant legal rule. Importantly, *Trados*'s formulation of the entire-fairness inquiry acknowledges the stark realities faced by directors like Tilton, who must act under demanding conditions and time constraints to salvage businesses on the brink of liquidation.

Tilton showed that TransCare had no future and no better alternative. Tilton thus could establish entire fairness by proving the Subject Collateral's $10 million price was fair.

37

**a.** TransCare undisputedly had no future. As the district court found—and the Trustee did not contest—TransCare faced "dire" circumstances in the weeks before its bankruptcy. SA112. TransCare struggled to make payroll, and "[v]irtually all key customers [were] pursuing or considering replacement options." JA1681. And Wells Fargo had warned the ABL would expire January 31, 2016, and would not be "extend[ed] or modif[ied]." JA2102. By February 2016, TransCare was in default on both the Term Loan and ABL loan—totaling $59 million in secured debt—and either loan could have been called at any time. TransCare was operating day-to-day, entirely dependent on voluntary funding from Wells Fargo that could cease immediately. JA724(41:3-12); JA2202.

As CMAG observed, "substantial" funding was "absolutely necessary" for TransCare to "survive." JA1670. Though not legally obligated to do so, SA43, Tilton stepped up and caused her personal investment vehicles to provide more than $10 million to help TransCare stay afloat, JA1829-30; she also authorized PPAS to release $690,000 to TransCare, JA690-91(58:21-59:8). That TransCare was "struggl[ing] to stay in existence in the face of significant cash flow problems" and relying on "[p]ersonal loans from its officers" meant it had no future in February 2016. *In re Coated Sales, Inc.*, 144 B.R. 663, 667 (Bankr. S.D.N.Y. 1992).

**b.** There was no better alternative to the Restructuring Plan in February 2016. With TransCare on its deathbed, Tilton had only two options (short of declaring

38

bankruptcy): find a third party willing to buy the debt-saddled NewCo business lines under short time constraints, or restructure TransCare to salvage those lines.

The first option was not available. When Tilton explored earlier potential sales in 2015 and early 2016, no third party ever made an offer or expressed even a *possible* interest in paying "a price that would have covered both Wells and the term loan lenders." JA679-80(47:22-48:3). When CMAG was retained to "prepare [TransCare] for a sale," JA410(77:13-19); *see* JA275-76(99:12-100:8), it too found no third-party buyer. Moreover, TransCare's business lines had value to a third party *only if* they could continue operating through a sale process. But that would take months, *see* JA399(54:20-22), and require "a significant infusion of cash," JA1711; JA749(88:13-15) ("[w]ithout financing, the company would have gone into immediate liquidation"). There was no time (or cash) to conduct a sales process when Wells Fargo could have called its loan and stopped funding at any minute.

So Tilton pursued the second option and tried to provide a recovery for creditors by saving parts of TransCare. There was no better alternative. *See* JA740(79:1-10) ("liquidation" was "the only alternative" to restructuring "[b]ecause there was no capital to go into the company and Wells was not willing to fund into the future"); JA2128-30 (TransCare did not "have the resources" for another option). Given the "obvious drawbacks" of a third-party sale, Tilton simply was not required "to explore alternative transactions." *Oberly v. Kirby*, 592 A.2d 445, 471-72 (Del. 1991).

Despite acknowledging that TransCare "could not have obtained additional financing by February 2016," SA126, the district court speculated a third party might have paid for "certain of its more profitable and 'less risky' business lines" as a going concern, even on "a condensed timeline and/or [with] minimal due diligence," SA126-27. That speculation was legal error. Where, as here, a company has "past deficit operations" and "bleak prospects for the future," it "is not realistic to assume that a potential buyer would pay [more than] the liquidated value of [its] assets." *New Haven Inclusion Cases*, 399 U.S. 392, 481-82 (1970) (rejecting "going-concern value over and above the liquidation value" for "a losing operation").

The district court's speculation is also factually baseless. Of the few companies expressing any interest in TransCare in 2015, *none* was willing to pay anything remotely close to going-concern value. *See* JA680(48:8-16) (National Express significantly reduced potential price); JA1192 (Richmond County significantly undervalued TransCare). Moreover, none made any offer or expressed any interest after December 2015. By February 2016—when Tilton faced her critical decision—there was even less prospect that some white knight would appear, as industry-wide factors had rendered para-transit businesses significantly less profitable, JA1331, TransCare was in a death spiral, and it could not even produce up-to-date financial statements for any potential sale, JA306.

40

The district court's assumption that a third party nevertheless would have purchased indebted business lines from a doomed ambulance company in a struggling industry *without current financial statements or any due diligence* is fanciful. The only third party interested enough to send a non-binding letter of intent expressly conditioned any offer on satisfactory due diligence. JA1205. While the court relied on a February 2016 email describing the proposed NewCo lines as "'less risky,'" SA126 (quoting JA1438), that email nowhere suggested third parties would make a purchase blind, without up-to-date financial statements or due diligence. Tilton's willingness to invest in a company she knew very well (and hence needed no additional diligence)—when she had already sunk into it millions of dollars that she (like other creditors) might never recover otherwise—does not suggest a third party would make the same substantial and risky investment, in a compressed timeframe, without meaningful insight into TransCare's dire finances.

The court also ignored that Tilton deemed those lines less risky only because she "would be providing all the new working capital for this business [her]self." JA1438; *see* JA2013 (EBITDA projections assumed "$8MM" in "funding" from Tilton). Without Tilton's $10 million in additional funding, those lines "we[re] worth zero because [they] had no cash coming in." JA719(13:4-6); JA721(15:3-5) (business with "all of the assets of what became NewCo" but "no money to run it"

41

was essentially worthless).  There is no evidence anybody would have paid going-concern value, much less going-concern value *plus* millions more in working capital.

Because "there is no indication in the record that more money"—indeed, *any* money—"was possible … from anyone else," it is irrelevant that TransCare's lines "w[ere] not shopped" around in February 2016.  *Cinerama*, 663 A.2d at 1140.

### 2. TransCare Received a Fair Price for the Subject Collateral

Given that the Restructuring Plan was the only viable option, the Transaction was entirely fair if $10 million was a fair price for the Subject Collateral.  *See Trados*, 73 A.3d at 76; *Cancan*, 2015 WL 3400789, at *26; *Blackmore*, 864 A.2d at 86.  It was.  That price far exceeded the property's $1.2 million liquidation value and $3.15 million book value.  The district court erred in comparing $10 million to the going-concern value when TransCare had no future.

**a.** Because TransCare was on the "brink of bankruptcy" when the Transaction occurred, SA105, liquidation value is the proper measure of fair price here.

A fair price is one a seller "would regard as within a range of fair value [and] could reasonably accept" considering "all of the circumstances."  *Cinerama*, 663 A.2d at 1143; *see Weinberger*, 457 A.2d at 711 (courts must consider "all relevant factors").  Depending on the circumstances, fair price is measured "on a going concern basis or a liquidation basis."  *In re Am. Classic Voyages Co.*, 367 B.R. 500, 508 (Bankr. D. Del. 2007).  The former measures "the value of a commercial enterprise's

42

assets … as an active business with future earning power," the latter "[t]he value … of an asset when it is sold in liquidation." *Value*, Black's Law Dictionary (11th ed. 2019). Put differently, going concern reflects "'market value,'" and liquidation "'distress value.'" *In re Trans World Airlines, Inc.*, 134 F.3d 188, 193-94 (3d Cir. 1998) (citation omitted).

As other Circuits have explained, going-concern value is appropriate only when the price "can be realized 'in a reasonable time' assuming a 'willing seller' and a 'willing buyer.'" *Trans World*, 134 F.3d at 193-94 (citation omitted); *see New Haven*, 399 U.S. at 445 (assets have no going-concern value "unless a buyer [is] willing to pay for it"). When "a company is only nominally extant, to treat it as a going concern would be misleading and would fictionalize the company's true financial condition." *Mama D'Angelo*, 55 F.3d at 555. Going-concern valuation thus "is not the proper standard if the business is 'on its deathbed.'" *Taxman Clothing*, 905 F.2d at 170 (citation omitted).

This principle is well settled. Where, as here, "the demise of a business is so clearly imminent that the business is incapable of generating any future revenues," its value should not assume such future revenues. *In re HHE Choices Health Plan, LLC*, 2019 WL 6112679, at \*5 (Bankr. S.D.N.Y. Nov. 15, 2019); *see*, *e.g.*, *Am. Classic*, 367 B.R. at 508 ("'liquidation value'" should be used when business is "'on its deathbed'" (citation omitted)); *In re Vision Hardware Grp., Inc.*, 669 A.2d 671, 677

(Del. Ch. 1995) (going-concern value approaches liquidation value "as the company moves close to forced liquidation").

Despite recognizing that TransCare was on the "brink of bankruptcy," SA105, the district court assessed fair price using going-concern value, SA133. That was legal error because TransCare manifestly was on its deathbed in February 2016. It had no future and was surviving only day-to-day through voluntary funding from Tilton and Wells Fargo; liquidation in bankruptcy was clearly imminent. Moreover, no "buyer w[as] willing to pay for" the Subject Collateral as a going concern, so going-concern valuation was inappropriate. *New Haven*, 399 U.S. at 445.

**b.** The Subject Collateral's $10 million price was fair because it far exceeded the assets' liquidation value. Indeed, that price was fair even under the district court's view that it should have included the value of three additional assets.

**i.** Both courts below found "the liquidation value of the Subject Collateral" was $1.2 million. SA147; *see* SA67 ("the value of the liquidation of the Subject Collateral to the Estate was only $1.2 million"). Liquidation value is the most that creditors would have recovered had the Transaction never occurred. In fact, when the Trustee sought approval to sell the Subject Collateral (in a process he ran), he agreed liquidation value was "the maximum benefit available," JA140, and "fair and reasonable," JA209. At more than eight times the liquidation value, the Subject Collateral's $10 million price was fair.

44

That price was fair even compared to the Subject Collateral's "book value," on which Tilton had based her $10 million figure.[3]  Despite inadvertently excluding $2.45 million in personal property that Tilton mistakenly thought would be OldCo's, *see* JA1730; JA2015, the $10 million figure still greatly exceeded the Subject Collateral's book value because it included (1) $6.2 million from two TransCare divisions that were defunct, hence worthless to Transcendence, by February 24, 2016, JA477-78(119:23-120:4); JA760-62(99:18-101:12); JA776(122:19-21); JA2203; JA2208; and (2) $3.1 million in accounts receivable that Tilton hoped to, but ultimately did not, purchase from Wells Fargo, JA1471; JA2009.

When $2.45 million is added in for the inadvertently excluded property and $9.3 million is removed for the two defunct divisions and accounts receivable, the Subject Collateral's total book value was $3.15 million—far less than the $10 million purchase price.

**ii.**  The district court nevertheless viewed the $10 million price as unfair because it believed the price wrongly excluded value from two certificates of need ("CONs") for TC Hudson Valley and TC Ambulance Corp. (two lines that ceased operating by February 24) valued at $3.2 million on a liquidation basis, and the MTA

---

[3]  Book value is an asset's net value on a company's books.  While generally "approximating liquidation value," *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000), it sometimes exceeds liquidation value due to accounting constraints.

contract, valued at $6-18 million on a going-concern basis. SA130. That analysis has two basic errors.

First, the CONs' value is irrelevant because, as the bankruptcy court found, "none of [them] were included in the Subject Collateral." SA30 n.15. These particular CONs belonged to TransCare lines that were *defunct* by February 24, so they "were not foreclosed on." JA588(135:20-25); *see* JA1875-76 (Trustee discussing these CONs separately from Subject Collateral). It was clear error for the district court to conclude otherwise. While the court speculated the CONs "increased the value of the stock of TC Hudson Valley and TC Ambulance Corp.," SA130, the stock of a defunct company has no value.

Second, the district court erroneously valued the MTA contract as a going concern. Liquidation value was the appropriate valuation measure, which is undoubtedly why the court used liquidation value for the two CONs. SA130. The MTA contract had zero liquidation value—as the parties agree. JA849.

Even including $3.2 million from the additional CONs and MTA contract, therefore, the Subject Collateral's liquidation value would have increased to only $4.4 million. If anything, the district court's analysis confirms the $10 million purchase price was more than fair.

### 3.    Tilton Engaged in Fair Dealing

Because the fair-price inquiry conclusively establishes entire fairness here, this Court need not address fair dealing. *See*, *e.g.*, *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 748 (Del. Ch. 2007) (pricing terms can be "so fair as to render the transaction entirely fair"). Regardless, Tilton engaged in fair dealing.

Fair dealing includes "questions of when the transaction was timed, how it was initiated, structured, [and] negotiated," as well as the "duty of candor," *Weinberger*, 457 A.2d at 711, and "reliance on accurate and complete information," *In re Opus E. LLC*, 698 F. App'x 711, 718-19 (3d Cir. 2017) (unpublished). Tilton engaged in fair dealing because she carefully consulted with independent financial advisors, kept necessary stakeholders informed, and focused on creditors' recovery. The district court's contrary conclusion ignores the vast majority of her dealings.

**a.** To begin, Tilton developed the Restructuring Plan only after considering—and rejecting—numerous alternatives throughout 2015 and early 2016. After fielding several inquiries from potential buyers in 2015 that substantially undervalued TransCare, Tilton retained CMAG, consultants with considerable expertise in corporate restructuring, to facilitate the sale of TransCare. SA13-14; JA275-76(99:12-100:8); JA410(77:13-19). Tilton then took significant measures to attempt a sale, instructing Greenberg to find investment bankers to market TransCare and agreeing

47

to additional funding for TransCare's immediate obligations. SA14-16. At Tilton's request, a plan to support a sale process was created and submitted to CMAG. SA14.

CMAG neither found a buyer nor recommended shopping or selling Trans-Care (or Chapter 11 bankruptcy). *See* JA1686. It instead advised Tilton to invest her own capital in TransCare despite the high risk. SA19. After studying CMAG's report and meeting with its staff, Tilton followed several of these recommendations. She agreed that selling TransCare was not possible and Chapter 11 bankruptcy not appropriate—conclusions reached in "good faith," as both courts found, SA43; SA126. And despite the high risk, Tilton continued to provide funding to TransCare, including $180,000 for new ambulances, JA2122, and $690,000 for insurance payments so TransCare could "live another day," JA690-91(58:21-59:15); JA2125. While Tilton decided in good faith not to fully fund TransCare, she had no legal obligation to do so. SA43.

Tilton's consideration of and attentiveness to CMAG's "outside analysis of the alternatives available … improve[s] the record on fair dealing." *Trados*, 73 A.3d at 65. So, too, does her "candor" in keeping essential stakeholders well informed throughout the process. *Weinberger*, 457 A.2d at 711. She was open with Wells Fargo, which could have shut down TransCare without notice, and other outside parties and TransCare executives. TransCare and Wells Fargo representatives engaged in "daily" discussions, JA699(67:13-16), at which Tilton shared models and

48

budgets, and continued to refine the restructuring plan based on input from Wells Fargo, its outside counsel, TransCare's executives and outside counsel, and CMAG, *see*, *e.g.*, JA1820; JA1846; JA2128; JA2197; JA2200; JA2206.

Tilton thus adopted the Restructuring Plan only after carefully studying the alternatives and giving careful consideration to creditors. Wells Fargo's obligations would be met through an orderly wind-down of OldCo, JA741(80:15-17), and the Term Loan Lenders would receive 45.3% of Transcendence's equity—their "best opportunity" at recovery if Transcendence succeeded. JA770-73(116:5-119:19); *see* JA647-48(8:16-9:7); JA666(33:14-18); JA1823. From start to finish, Tilton engaged in fair dealing.

**b.** The district court disagreed because Tilton purportedly "presented no evidence that she considered any alternative" to the Restructuring Plan and obtained "no review by a disinterested party" between February 5 and February 24. SA123-24. That is plainly false. As just explained, Tilton worked closely with Wells Fargo and CMAG *in February 2016* to develop the Restructuring Plan. Regardless, the court mistook the forest for the trees.

The only way to ascertain "when the transaction was timed" or "how it was initiated," *Weinberger*, 457 A.2d at 711, is to understand why Tilton adopted the Restructuring Plan in the first place. That requires a broader frame spanning months

49

of Tilton's prior deliberations over potential alternatives, including Chapter 11 bank-ruptcy and selling all or part of TransCare. The district court apparently would have required Tilton, after deciding bankruptcy was inevitable in February 2016, to re-consider and revisit every option she and CMAG had already rejected and rehire another outside advisor to reiterate that TransCare had no other options. But there was no time—let alone point—to undertake such a redundant process. *Cf. Glassman v. Unocal Expl. Corp.*, 777 A.2d 242, 247-48 (Del. 2001) ("If, instead, the corporate fiduciary sets up negotiating committees, hires independent financial and legal ex-perts, etc., then it will have lost the very benefit [of] a simple, fast and inexpensive process for accomplishing a merger").

The district court made two additional analytical errors. First, the court em-phasized Tilton did not keep Credit Suisse informed about her plan. SA124. That is irrelevant because foreclosure of the Subject Collateral did not require Credit Suisse's consent. JA893; JA934-35; JA940; JA2036. Second, the court assumed Tilton should have attempted to sell certain TransCare lines even though she had no obligation to do so (and CMAG found no buyer). But in February 2016, TransCare was shedding employees and customers daily, and neither TransCare nor CMAG could produce accurate financial statements. JA1683-84; JA1688. As explained above, no third party would have purchased TransCare's debt-saddled lines without up-to-date financial statements or due diligence. Because selling TransCare lines

50

was "not [an] economically rational alternative[]," it "need not be considered by a court." *Thorpe ex rel. Castleman v. CERBCO, Inc.*, 676 A.2d 436, 443 (Del. 1996).

The judgment against Tilton should therefore be reversed.

## II. The Courts Below Committed Legal Error In Awarding Damages

The Trustee's parallel damages theories are premised on Tilton's expected valuation of NewCo (Transcendence) had the Restructuring Plan succeeded. Both fail for two reasons. First, because bankruptcy was inevitable without that plan, the Trustee failed to prove the conveyance or Tilton caused the estate any actual harm. Second, the courts below erred in measuring damages based on the Subject Collateral's purported going-concern value. The Trustee was required to prove the Subject Collateral actually had going-concern value over and above the liquidation value he recouped for the estate—yet he failed to do so. Having already received the Subject Collateral's liquidation value, the estate is not entitled to the $39.2 million windfall awarded below.

### A. The Estate Is Entitled to No Damages for Any Actual Fraudulent Conveyance

Even had there been an actual fraudulent conveyance, the estate would be entitled to only such damages as would make it whole, *see In re Belmonte*, 931 F.3d 147, 155 (2d Cir. 2019), and "restore [it] to the condition it would have been in if the transfer had never occurred," *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017).

The estate here has *already* been made whole. The Trustee obtained satisfaction when he recovered and liquidated the Subject Collateral with the consent of Tilton, PPAS, and Transcendence. And even had the estate been harmed, it was legal error to use going-concern value to measure damages. The estate is entitled to no more than the Subject Collateral's liquidation value, which it already received.

### 1. The Transfer Caused No Damages

Where a transfer has been avoided, a bankruptcy trustee may "recover, for the benefit of the estate, the property transferred, or … the value of such property." 11 U.S.C. § 550(a). The Bankruptcy Code thus gives the Trustee a choice: recover *either* the Subject Collateral *or* its value. *See id.* § 550(d) ("[t]he trustee is entitled to only a single satisfaction"). The Trustee here, however, recovered *both* the Subject Collateral (which he liquidated pursuant to a court-approved stipulation) *and* its purported going-concern value (in damages). As a result, the damages award violates the bedrock principle that "[t]he trustee is not entitled to double recovery, or a windfall that would benefit the estate." *In re Andrew Velez Constr., Inc.*, 373 B.R. 262, 275 (Bankr. S.D.N.Y. 2007).

As this Court has explained, "it is the rare bankruptcy trustee that has the audacity to bring such a claim" for double recovery. *In re Bean*, 252 F.3d 113, 116 (2d Cir. 2001). Like the *Bean* trustee, the Trustee here "has already recovered the

equity value of the property from the transferor," *id.*—indeed, he received the Subject Collateral "free and clear" of encumbrances, JA178; JA1894. He subsequently controlled that property's sale and decided to liquidate it at public auction with Tilton's and the Patriarch Entities' consent. Accordingly, he is not entitled to "the fair market value of [that] property," as Section 550(d) "categorically limits" his recovery "'to only a single satisfaction.'" *Bean*, 252 F.3d at 116-17 (citation omitted).

Having chosen to liquidate the Subject Collateral and distribute the proceeds, the Trustee cannot argue that damages is a more appropriate remedy. Regardless, each factor courts consider in determining whether to award the property or its value—*i.e.*, whether the property's value "(1) is contested; (2) is not readily determinable; or (3) is not diminished by conversion or depreciation"—shows that receipt of the property constituted satisfaction here. *Andrew Velez*, 373 B.R. at 274; *see* 5 Collier on Bankruptcy ¶ 550.02[3].

The Subject Collateral's value plainly was contested; and unless the Court and the Trustee accept Tilton's calculation of that value, the dispute renders the value not readily determinable. "[W]hen conflicting evidence exists on the value of the transferred property, courts have ordered the property to be returned." *In re Bremer*, 408 B.R. 355, 360 (B.A.P. 10th Cir. 2009) (citing cases). Even on the Trustee's assumption that the Subject Collateral had going-concern value, the parties dispute

what evidence should be used to calculate that value.  *See*, *e.g.*, JA858-60 (disputing use of internal projections).  Thus, "the correct remedy is to return the property, not award an estimate of [its] value."  *In re Taylor*, 599 F.3d 880, 892 (9th Cir. 2010).  The property here was already returned—and was sold by the Trustee.

Finally, the Subject Collateral's value was not diminished by conversion or depreciation—indeed, it was "transferred" only on paper, and Transcendence agreed within days that the Trustee could include the property in his liquidation process.  *See* JA1891-99.  The Trustee himself prevented Transcendence from operating as a going concern by immediately blocking access to a computer server needed for Transcendence to operate, *see* JA610-11(165:23-166:4); JA661(26:6-9); JA1479; denying access to TransCare's systems so Transcendence could not issue payroll checks, JA601(148:22-25); and "prevent[ing] [Transcendence's] ability to operate" by contesting the Subject Collateral's ownership, JA1863.  Having prevented the Subject Collateral from attaining going-concern value and then choosing to liquidate it at public auction, the Trustee was responsible for any theoretical harm to the estate.

The conveyance did not cause the estate harm for another reason:  Had the Transaction never occurred, TransCare still would have gone bankrupt, and the Subject Collateral still would have been liquidated.  Because the conveyance did not cause the estate to "los[e] anything of value," no damages are appropriate.  *In re*

*EBC I, Inc.*, 380 B.R. 348, 366 (Bankr. D. Del. 2008), *aff'd*, 400 B.R. 13 (D. Del. 2009), *aff'd*, 382 F. App'x 135 (3d Cir. 2010) (unpublished).

### 2. Going-Concern Value Is Improper as a Matter of Law

Even assuming the Trustee showed actual harm, the courts below committed legal error in using the wrong damages measure (*i.e.*, going-concern value). SA76-77; SA133-34. In February 2016, TransCare was "woefully insolvent." SA88. It was the Trustee's burden to prove the Subject Collateral actually had going-concern value when TransCare faced imminent liquidation in bankruptcy proceedings. *See, e.g.*, *Curtis T. Bedwell & Sons, Inc. v. Int'l Fid. Ins. Co.* ("*CT Bedwell*"), 843 F.2d 683, 689 n.13 (3d Cir. 1998). Because he failed to do so as a matter of law, the estate was entitled to only the liquidation value that it has already received.

**a.** Going-concern value was inappropriate for two independent reasons.

First, TransCare was on its deathbed and on the brink of liquidation through bankruptcy throughout February 2016. *See Mama D'Angelo*, 55 F.3d at 555; *Taxman Clothing*, 905 F.2d at 170; *In re M. Silverman Laces, Inc.*, 404 B.R. 345, 362 (Bankr. S.D.N.Y. 2009) (rejecting going-concern value because company could not "pay its rent, largest supplier, and other creditors" and "lacked unencumbered assets to pledge for new credit"); *Coated Sales*, 144 B.R. at 667 (similar). Where, as here, a company faces imminent liquidation, its assets are worth only "what could be obtained at a liquidation sale." *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 111

(Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001); *see also*, *e.g.*, *In re Schwinn Bicycle Co.*, 192 B.R. 477, 487 (Bankr. N.D. Ill. 1996) (using liquidation value "because the Debtor was not financially viable, was in severe financial distress and was on its 'deathbed'" for "ninety days" before bankruptcy).

"The key difference between liquidation value and [going-concern] value is that the latter involves a reasonable time frame." *Adler*, 247 B.R. at 111. But Trans-Care did not have reasonable time for any sale in February 2016. Wells Fargo could have ceased funding at any point (and repeatedly threatened to do so), which would have *immediately* shut down TransCare. *See* JA755-56(94:23-95:2); JA1443. Even had there been a potential third-party buyer, there was no evidence that TransCare could have continued operations long enough to conduct the due diligence and sale process needed to sell the Subject Collateral as a going concern. *See CT Bedwell*, 843 F.2d at 689 n.13 (awarding no damages where trustee's "evidence did not establish the value of [the company] as a going concern").

Second, it was error to use going-concern value because the Trustee failed as a matter of law to establish there was a third-party "'willing buyer.'" *Trans World*, 134 F.3d at 193-94 (citation omitted); *see New Haven*, 399 U.S. at 445 (going-concern value requires "buyer willing to pay for it"). The district court noted that one third party "expressed interest in buying all or part of TransCare" in March 2015—nearly a year before the bankruptcy—and that certain third parties made "unsolicited

calls" to TransCare in December 2015.  SA109 n.19.  But that comes nowhere close to indicating a third party was actually willing to buy debt-ridden business lines without current financial statements or adequate due diligence in February 2016.

Again, no third party made any binding offer; the only non-binding letter of intent received was itself conditional on satisfactory due diligence, JA1205—which was no longer possible in February 2016 given the compressed timeline and day-to-day instability, *see* JA755-56(94:23-95:2); JA1443; third parties were interested only in paying *far less* than the going-concern value, *see* JA679-80(47:22-48:16); JA1192; and such interest *ceased* after December 2015, when it became clear Trans-Care would soon be liquidated in bankruptcy.  On this record, it is gross speculation that anybody was willing to pay the going-concern value in February 2016.

**b.**  Both courts below valued the Subject Collateral as a going concern on the basis that the NewCo business lines had future value *to Tilton* if she could have continued operations (with her own $10 million capital investment).  SA76-77; SA133-34.  Of course, the Trustee prevented such operation, and Tilton ultimately gained nothing.  Regardless, the proper focus "'is not on what the transferee *gained* by the transaction, but rather on what the bankruptcy estate *lost* as a result of the transfer.'"  *In re Colonial Realty Co.*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998) (citation omitted; emphases added); *accord*, *e.g.*, *In re Labsource, LLC*, 632 B.R. 724, 729 (Bankr. D.S.C. 2021).  That is because Section 550(a) focuses solely on the

estate and whether a trustee's recovery is "for the benefit of the estate." 11 U.S.C. § 550(a); *see* 5 Collier on Bankruptcy ¶ 550.02[2] ("section 550(a) limits the trustee by permitting recovery only for the benefit of the estate").

While both courts thought "'Tilton's willingness to acquire the assets and invest $10 million'" was "'the best evidence that Transcendence had substantial value,'" SA134 (quoting SA49), they ignored that, *without* that $10 million from Tilton, Transcendence "was worth zero because it had no cash coming in," JA719(13:4-6); *see* JA721(15:3-5) (an entity with "all of the assets of what became NewCo but had no money to run it" was worth only the assets' liquidation value). Moreover, both courts ignored the undisputed reason *why* Tilton made that investment. She did so not to capitalize on TransCare's value, but as a final effort "to save some of our company" and improve all lenders' recovery. JA1463; JA1823. Tilton certainly "care[d] deeply" for the fate of TransCare, JA1467, and had long been pouring in money so it could survive, *see* JA1829; JA2092; JA2120; JA2122; JA2125. No third party, however, would have been willing to make the same (blind) sacrifice, as none stood in similar shoes.

The district court's assumption that the Subject Collateral held value that TransCare did not, SA133, is not supported by legally sufficient evidence. The business lines were unstable: TransCare had no contractual right to any working capital, *see* JA2202; faced crushing debt after defaulting on the ABL and Term Loan, JA112;

JA1628; JA1822; and, shortly before the Transaction, lost valuable contracts meant to go to Transcendence, JA761(100:11-14). Then, the Trustee made Transcendence's operations impossible by blocking access to necessary systems and resources.

There is no basis for assuming the Subject Collateral held going-concern value of $39.2 million in February 2016, when there was no guarantee TransCare could keep the lights on. The only value that property had was the $1.2 million the estate recovered at auction. And given that the Trustee himself smothered Transcendence in its crib the day it was born, the Trustee's expert's "valuation" of this never-going concern was inherently speculative, fanciful, and unreliable. The courts below "abuse[d] [their] discretion" in admitting this "speculative" evidence, let alone relying on it. *E.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996); *cf. Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). But since it was legal error to use going-concern value at all, the many errors committed by the courts in calculating that value need not be addressed.

*     *     *

Both courts below found that the estate already received the Subject Collateral's $1.2 million liquidation value pursuant to a court-supervised sale process. SA67; SA147. The Trustee identifies no assets for which the estate was not compensated through liquidation, nor any impairment to the assets' value that the Transaction caused. With the estate already restored "to the condition it would have

been in if the transfer had never occurred," *Madoff*, 568 B.R. at 486, any damages award—much less $39.2 million—would constitute an impermissible windfall for the estate.[4]

The damages award against the Patriarch Entities should be vacated.

## B. The Estate Is Entitled to No Damages for Any Breach of Fiduciary Duties

The district court made two interrelated errors concerning the Trustee's burden to prove that any fiduciary-duty breach caused TransCare harm. First, the court misunderstood that burden, requiring the Trustee to prove only the *amount* of damages, when he failed to prove Tilton *caused* any harm. Second, the court committed legal error in measuring damages using going-concern value, rather than liquidation value.

### 1. The Trustee Failed to Prove Actual Harm

The Trustee was required to prove that "[Tilton's] conduct proximately caused [TransCare's] injury." *In re Olsen Indus., Inc.*, 2000 WL 376398, at *12 (D. Del. Mar. 28, 2000). He failed to meet his burden, as the alleged injury "'would have occurred without [Tilton's conduct].'" *Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991) (citation omitted). The district court put the cart before the horse in

---

[4] Because there are no actual damages on this claim, New York Law requires vacatur of the attorneys' fees award against PPAS pursuant to N.Y.D.C.L. § 276-a. *See Excelsior Cap. LLC v. Allen*, 536 F. App'x 58, 61-62 (2d Cir. 2013) (summary order); *Murphy v. RMTS Assocs., LLC*, 71 A.D.3d 582, 583 (N.Y. App. Div. 2010).

requiring the Trustee to prove only the amount of supposed damages without also showing whether Tilton caused any damages.  SA131-39.

Had Tilton never implemented the Restructuring Plan, TransCare would have filed for bankruptcy, the Trustee would have liquidated the Subject Collateral, and the estate would have recovered (only) the property's liquidation value.  The Restructuring Plan, in the real world, did not affect that chain of events—including the amount recovered by the Trustee on behalf of the estate and creditors.  Accordingly, the Trustee failed to prove that Tilton's conduct caused any harm.  *See*, *e.g.*, *Thorpe*, 676 A.2d at 444 (holding defendants' fiduciary breach in failing to disclose interested buyer was not "the proximate cause of the nonconsummation of the transaction" because any offer would have been rejected even without the breach).

The district court assumed Tilton's "refusal to consider the possibility of selling any of TransCare's business lines undermined any chance that the company had at a third-party sale."  SA129.  But CMAG had been specifically engaged to find a buyer, yet could not do so.  *See* JA410(77:13-19); JA275-76(99:12-100:8).  Regardless, the court inverted the burden of proof in faulting *Tilton* for "provid[ing] no evidence" that she could not "line[] up a third-party buyer."  SA127.  It was the *Trustee* who "'b[ore] the burden,'" *Cinerama*, 663 A.2d at 1136 n.2 (citation omitted), to prove a third party actually would have purchased all or part of a doomed

company, under a timeframe that precluded due diligence, for more than the liqui-

dation value.  As explained above, the Trustee fell far short of satisfying his burden.

### 2.    Going-Concern Value Is Improper as a Matter of Law

Even assuming *arguendo* that Tilton caused the estate *some* harm, the dam-

ages award still should be vacated because, as a matter of law, the Trustee failed to

establish that going-concern value was the proper damages measure.  For the same

reasons given above, which are incorporated here, using going-concern value instead

of liquidation value to measure damages was legal error.  *See* SA127.  Among other

things, the Trustee himself made it impossible for Transcendence to operate.  For

him to turn around and seek going-concern value is a fine example of chutzpah.

Because the estate has already recovered the liquidation value, any damages

award would serve only to punish Tilton, not compensate the estate.  Indeed, the

estate would receive a windfall.  That is "[o]bviously" improper under Delaware

fiduciary law.  *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006).

### 3.    The Court Should Award Nominal Damages Only

If the Court does not simply reverse the judgment against Tilton, the proper

remedy is to award $1 in nominal damages.  Under Delaware law, the Trustee's

"fail[ure] to prove non-speculative damages" means his "recovery is limited to nom-

inal damages."  *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL

5192179, at *13 (Del. Ch. Oct. 10, 2014); *see Oliver v. Boston Univ.*, 2006 WL

1064169, at *25 (Del. Ch. Apr. 14, 2016) (awarding nominal damages where "the only harm suffered" for fiduciary breach "was … procedural"); *OptimisCorp v. Waite*, 2015 WL 5147038, at *73 (Del. Ch. Aug. 26, 2015) (similar).

## CONCLUSION

For the foregoing reasons, the Court should reverse both judgments. Alternatively, the Court should vacate both damages awards.

Dated:  March 29, 2022                          Respectfully submitted,

                                                           /s/ Mark A. Perry
                                                           Mark A. Perry
                                                           Miguel A. Estrada
Michael T. Mervis                           Kellam M. Conover
PROSKAUER ROSE LLP                     GIBSON, DUNN & CRUTCHER LLP
11 Times Square                              1050 Connecticut Avenue, N.W.
New York, N.Y.  10036                     Washington, D.C.  20036
(212) 969-3000                                (202) 955-8500


*Counsel for Defendants-Appellants Lynn Tilton; Patriarch Partners Agency Services, LLC; Transcendence Transit, Inc.; and Transcendence Transit II, Inc.*

63

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitations of Second Circuit Rule 32.1(a)(4)(A), which are authorized by Federal Rule of Appellate Procedure 32(e), because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 13,984 words, as determined by the word-count function of Microsoft Word 2016.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated:  March 29, 2022

/s/ Mark A. Perry
Mark A. Perry

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2022 I caused the foregoing Brief for Defendants-Appellants to be filed with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system and served on all counsel of record via CM/ECF.


Dated: March 29, 2022

/s/ Mark A. Perry
Mark A. Perry