# 21-2547

# United States Court of Appeals for the Second Circuit

IN RE: TRANSCARE CORPORATION,

*Debtor.*

(*Caption Continued on Inside Cover*)

On appeal from the United States District Court for the
Southern District of New York (Kaplan, J.)

## BRIEF FOR TRUSTEE-APPELLEE

AVERY SAMET
AMINI LLC
131 W. 35th Street 12th Floor
New York, N.Y. 10001
Tel.: (212) 490-4700
Fax: (212) 490-8222
asamet@aminillc.com

CARTER G. PHILLIPS
WILLIAM R. LEVI
AARON P. HAVILAND
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
cphillips@sidley.com

*Counsel for Trustee-Appellee*

SALVATORE LAMONICA, as Chapter 7 Trustee of the
Jointly-Administered Estates of TransCare Corporation,

*Plaintiff-Appellee,*

SHAMEEKA IEN,

*Plaintiff,*

v.

LYNN TILTON,

*Defendant-Appellant,*

PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS,
LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO
20011, LIMITED, ARK INVESTMENT PARTNERS II, L.P., LD INVESTMENTS,
LLC, PATRIARCH PARTNERS II, LLC, PATRIARCH PARTNERS III, LLC, PA-
TRIARCH PARTNERS VIII, LLC, PATRIARCH PARTNERS XIV, LLC, PATRI-
ARCH PARTNERS XV, LLC, TRANSCENDENCE TRANSIT, INC., TRANSCEND-
ENCE TRANSIT II, INC.,

*Defendants.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................iii

PRELIMINARY STATEMENT...................................................... 1

ISSUES PRESENTED ..................................................................5

STATEMENT OF THE CASE ..........................................................5

    A.    Factual Background..................................................... 5

    B.    Procedural History ................................................... 19

        1.    Bankruptcy Court Proceedings ................................... 19

        2.    District Court Proceedings ..........................................25

SUMMARY OF ARGUMENT ..................................................... 27

STANDARD OF REVIEW...............................................................29

ARGUMENT ...................................................................... 30

I.    The District Court and the Bankruptcy Court Correctly Determined Liability................................................................. 30

    A.    The District Court Correctly Determined that Tilton Breached her Fiduciary Duties to TransCare. ..................... 30

        1.    Tilton Failed to Prove Fair Dealing. .......................... 32

        2.    Tilton Failed to Prove Fair Price. .............................. 42

    B.    The Bankruptcy Court Correctly Determined that the Transaction Was a Fraudulent Conveyance......................... 46

        1.    Actual Intent to Hinder, Delay, or Defraud Creditors Is a Question of Fact Reviewed for Clear Error. ....................................................... 50

2. The Bankruptcy Court Did Not Commit Clear Error in Finding Actual Intent to Hinder, Delay, or Defraud. ...................................................................52

3. The Bankruptcy Court Did Not Otherwise Fail to Consider Evidence of Honest Intent or a Legitimate Supervening Purpose, Much Less Commit Legal Error....................................................55

II. The District Court and the Bankruptcy Court Correctly Determined Damages....................................................58

A. The District Court Did Not Commit Clear Error in Calculating the Damages for Tilton's Breach of her Fiduciary Duties....................................................58

B. The Bankruptcy Court Did Not Commit Clear Error in Calculating the Damages for the Fraudulent Conveyance....................................................66

CONCLUSION ....................................................70

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acequia, Inc.,*
34 F.3d 800 (9th Cir. 1994) .................................................................. 50

*Anderson v. City of Bessemer,*
470 U.S. 564 (1985) ............................................................................ 53

*Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose,*
235 F. App'x 776 (2d Cir. 2007) ......................................................... 52

*Beard Rsch., Inc. v. Kates,*
8 A.3d 573 (Del. Ch.), *aff'd,* 11 A.3d 749 (Del. 2010) .................... 59, 62

*In re Bonnanzio,*
91 F.3d 296 (2d Cir. 1996) .................................................................. 50

*Cinerama, Inc. v. Technicolor, Inc.,*
663 A.2d 1156 (Del. 1995) ................................................................... 42

*Del. Open MRI Radiology Assocs. v. Kessler,*
898 A.2d 290 (Del. Ch. 2006) .............................................................. 60

*Diebold Found., Inc. v. Comm'r,*
736 F.3d 172 (2d Cir. 2013) ................................................................ 51

*In re Enron Corp.,*
419 F.3d 115 (2d Cir. 2005) ................................................................ 29

*Freeland v. Enodis Corp.,*
540 F.3d 721 (7th Cir. 2008) ............................................................... 51

*Google LLC v. Oracle Am., Inc.,*
141 S. Ct. 1183 (2021) ......................................................................... 51

*Guzzo v. Cristofano,*
719 F.3d 100 (2d Cir. 2013) ................................................................ 52

*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
302 F.3d 18 (2d Cir. 2002) ......................................................29

*Hausman v. Buckley*,
299 F.2d 696 (2d Cir. 1962) ....................................................30

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) ......................................................48

*In re Hydrogen, L.L.C.*,
431 B.R. 337 (Bankr. S.D.N.Y. 2010) ....................................30

*Int'l Telecharge, Inc. v. Bomarko, Inc.*,
766 A.2d 437 (Del. 2000) ........................................................59

*In re Jeffrey Bigelow Design Group, Inc.*,
956 F.2d 479 (4th Cir. 1992) ..................................................50

*In re Kaiser*,
722 F.2d 1574 (2d Cir. 1983) ...........................................24, 48

*Liebowitz v. Bandshell Artist Mgmt.*,
6 F.4th 267 (2d Cir. 2021) .......................................................51

*In re Manhattan Inv. Fund Ltd.*
397 B.R. 1 (S.D.N.Y. 2007) ....................................................53

*In re Manshul Constr. Corp.*,
No. 96B44080(JHG), 2000 WL 1228866 (S.D.N.Y. Aug. 30,
2000) .........................................................................................47

*In re Mazzeo*,
167 F.3d 139 (2d Cir. 1999) ....................................................29

*In re Miller*,
39 F.3d 301 (11th Cir. 1994) .............................................50, 51

*New Haven Inclusion Cases*,
399 U.S. 392 (1970) ...........................................................41, 42

*Oberly v. Kirby*,
592 A.2d 445 (Del. 1991) ...................................................40, 41

*In re Opus E., LLC*,
528 B.R. 30 (Bankr. D. Del. 2015), *aff'd*, No. 15-346-GA, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017) ......................................................................31

*In re Orchard Enters., Inc.*,
88 A.3d 1 (Del. Ch. 2014) ..............................................................59

*P.R. Mar. Shipping Auth. v. Fed. Mar. Comm'n*,
678 F.2d 327 (D.C. Cir. 1982) .......................................................56

*Pereira v. Cogan*,
267 B.R. 500 (S.D.N.Y. 2001) ..................................................31, 38

*Reis v. Hazelett Strip-Casting Corp.*,
28 A.3d 442 (Del. Ch. 2011) .............................................31, 42, 43

*In re Roblin Indus., Inc.*,
78 F.3d 30 (2d Cir. 1996) ...............................................................43

*Rosen v. Unilever U.S., Inc.*,
No. C 09-02563 JW, 2010 WL 4807100 (N.D. Cal. May 3, 2010) .........................................................................................37

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
568 B.R. 481 (Bankr. S.D.N.Y. 2017) ............................................67

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005) .............................................................48

*In re Sherman*,
67 F.3d 1348 (8th Cir. 1995) .........................................................50

*In re Smith*,
321 F. App'x 32 (2d Cir. 2009) ......................................................50

*Thorpe ex rel. Castleman v. CERBCO, Inc.*,
676 A.2d 436 (Del. 1996) ...............................................................59

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001) .............................................................70

*In re Trados Inc. Shareholder Litig.*,
73 A.3d 17 (Del. Ch. 2013) .......................................................... 38, 39

*In re Trans World Airlines, Inc.*,
134 F.3d 188 (3d Cir. 1998) ............................................................. 64

*In re TransTexas Gas Corp.*,
597 F.3d 298 (5th Cir. 2010) ............................................................ 50

*In re Trib. Co. Fraudulent Conv. Litig.*,
10 F.4th 147 (2d Cir. 2021) .............................................................. 48

*In re Trib. Co. Fraudulent Conv. Litig.*,
No. 11-MD-2296 (RJS), 2017 WL 82391 (S.D.N.Y. Jan. 6,
2017), *aff'd*, 10 F.4th 147 (2d Cir. 2021) ............................................ 49

*United States v. Coppola*,
85 F.3d 1015 (2d Cir. 1996) ............................................................. 51

*United States v. Evseroff*,
528 F. App'x 75 (2d Cir. 2013) ......................................................... 52

*United States v. Murdock*,
667 F.3d 1302 (D.C. Cir. 2012) ......................................................... 56

*U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v.
Vill. at Lakeridge, LLC*,
138 S. Ct. 960 (2018) ..................................................................... 51

*Valeant Pharms. Int'l v. Jerney*,
921 A.2d 732 (Del. Ch. 2007) ...................................................... 27, 31

*In re Watman*,
301 F.3d 3 (1st Cir. 2002) ............................................................... 51

*Weinberger v. UOP, Inc.*,
457 A.2d 701 (Del. 1983) .............................................. 21, 27, 31, 32

*In re Wiggains*,
848 F.3d 655 (5th Cir. 2017) ........................................................... 50

*William Penn P'ship v. Saliba,*
  13 A.3d 749 (Del. 2011) ................................................................. 31, 42

**Statutes**

11 U.S.C. § 523(a)(2)(B) ...................................................................... 50

11 U.S.C. § 547(b) .............................................................................. 25

11 U.S.C. § 548(a)(1) ..................................................................... 28, 47

11 U.S.C. § 548(a)(1)(A) ..................................................................... 24

11 U.S.C. § 550(a) ........................................................................ 24, 66

11 U.S.C. § 551 .................................................................................. 25

N.Y. Debt. & Cred. Law § 276 (2020) ............................................. 24, 47

N.Y. Debt. & Cred. Law § 273 (2020) .................................................. 25

**Other Authorities**

*Book Value*, Black's Law Dictionary (11th ed. 2019) ............................. 20

*Value*, Black's Law Dictionary (11th ed. 2019) ...................................... 20

## PRELIMINARY STATEMENT

This appeal will mark the third time a court will have reviewed the facts surrounding a self-interested transaction that occurred in February 2016. Both the bankruptcy court and the district court concluded that the individual responsible breached her fiduciary duties of loyalty and good faith and acted with the intent to hinder, delay, or defraud her creditors. Those judgments are reviewed for clear error and should be affirmed.

TransCare was a financially distressed ambulance company owned and managed by Lynn Tilton. It survived on loans from Wells Fargo, Credit Suisse, and Tilton herself. In October 2015, Wells Fargo informed Tilton that it planned to discontinue its loan facility and demanded that TransCare repay its debt of $13 million. Tilton convinced Wells Fargo to postpone its withdrawal of support, and in return she promised to sell TransCare.

Tilton did not keep her word. Throughout 2015, she ignored numerous offers to buy all or part of TransCare and forbade her staff from speaking to any potential buyers. Instead, she devised a plan in early February 2016 to sell TransCare's more profitable divisions to herself at a price that she would fix. Those divisions would continue to operate as

a going concern under a new company named "Transcendence." Meanwhile, the remaining divisions at TransCare would file for bankruptcy.

Tilton executed her plan on February 24, 2016. Through one of her investment vehicles, she foreclosed on the stock of three TransCare divisions, all of TransCare's physical assets, and TransCare's contract with the New York Metropolitan Transit Authority ("MTA"). She then sold those assets to Transcendence for $10 million. What was left of TransCare immediately filed for bankruptcy.

The flaws in Tilton's chaotic plan became apparent the next day, when Salvatore LaMonica was appointed the trustee of the TransCare estate. Transcendence now owned all the ambulances, but the drivers were still employed by TransCare, which did not have enough money to pay them. The trustee refused to allow the TransCare employees to work without compensation. Although Tilton could have solved the problem by loaning TransCare another $200,000 to meet payroll, she declined to do so and instead fired Transcendence's employees. Moreover, Tilton waited until the last minute to negotiate a transfer of the MTA contract from TransCare to Transcendence and ultimately decided not to make the transfer. After having operated Transcendence for only three days and

then effectively gutting it, Tilton transferred its assets back to the trustee for liquidation.

The trustee initiated adversary proceedings against Tilton and her investment companies. He alleged that Tilton breached her fiduciary duties of loyalty and good faith under Delaware law and that her investment companies conducted an actual fraudulent conveyance in violation of the Bankruptcy Code and the New York Debtor and Creditor Law. The bankruptcy court conducted a six-day bench trial, at which it heard testimony from Tilton, her advisers, and the trustee.

After a year of considering a voluminous record, the trial testimony, and the parties' post-trial briefs, the bankruptcy court issued a detailed, 100-page opinion ruling against Tilton. It concluded that Tilton had breached her fiduciary duties to TransCare. Because the foreclosure and sale of the TransCare assets constituted a self-interested transaction, Tilton had the burden of proving the "entire fairness" of the transaction—Delaware's most demanding standard of review—by showing that she both engaged in fair dealing and paid a fair price. Tilton failed to meet her burden because there was nothing fair about the way she conducted

the transaction and because $10 million grossly underestimated the going-concern value of the TransCare divisions that were transferred to Transcendence.

The bankruptcy court also found that Tilton's investment companies had engaged in an actual fraudulent transaction because Tilton, whose intent was imputed to those companies, acted with the intent to hinder, delay, or defraud TransCare's creditors. In reaching this conclusion, the bankruptcy court relied on "badges of fraud"—circumstances that are closely associated with fraudulent transfers and permit the inference of fraudulent intent. It awarded the trustee $39.2 million in damages for the actual fraudulent conveyance, which it calculated based on the going-concern value of the TransCare assets. It recommended a similar amount for the breach of fiduciary duties, although the trustee was entitled to only a single recovery.

The district court affirmed the bankruptcy court's reasoning and conclusions almost in their entirety, making one small modification to the damages award for the breach of fiduciary duties. Now, more than six years after the original transaction and after two opportunities to present her case, Tilton hopes that this Court will reach a different result. But

the findings below are reviewed for clear error, and there was no error in the lower courts' decisions.

The judgments below should be affirmed.

## ISSUES PRESENTED

1. Whether the courts below clearly erred in concluding that Tilton breached her fiduciary duties and that the transaction was an actual fraudulent conveyance.

2. Whether the courts below clearly erred in calculating damages for the breach of fiduciary duties and the actual fraudulent conveyance.

## STATEMENT OF THE CASE

### A. Factual Background

TransCare, a Delaware corporation headquartered in Brooklyn, provided ambulance and paratransit services throughout the mid-Atlantic Region. JA302. Its sole director was Lynn Tilton, who indirectly held the majority of the company's equity. JA302–03. Credit Suisse owned or managed a quarter of TransCare's equity, and various entities and individuals owned the remainder. JA196–97.

TransCare had two lines of credit. The first was a revolving, asset-based loan facility ("ABL") with Wells Fargo, N.A. JA304. The second,

the "term loan," was a secured credit agreement between TransCare and six lenders: Ark Investment Partners, which was one of Tilton's personal investment vehicles; three entities known collectively as the Zohar Funds, which were managed by Tilton; Credit Suisse; and First Dominion Funding I, which was managed by Credit Suisse (collectively, the "term loan lenders"). JA303–04. Another one of Tilton's companies, Patriarch Partners Agency Services, LLC ("PPAS"), served as the administrative agent for the term loan and had the authority to act on behalf of the term loan lenders. JA302–03.

The Wells Fargo ABL and the term loan were both secured by blanket liens on TransCare's assets. JA1001–03; JA2023–24. Priority over those assets was governed by an intercreditor agreement signed by PPAS and Wells Fargo. JA304. Under this agreement, the term loan lenders had a first priority lien on TransCare's vehicles, other physical assets, capital stock of the TransCare subsidiaries, and intellectual property (the "term loan priority collateral"), while Wells Fargo had a first priority lien on all other assets (the "ABL priority collateral"). JA1152–54; JA1175.

6

In 2015, TransCare began to have problems funding its payroll and paying its vendors. JA306. Tilton and her staff regularly received inquiries and offers from parties interested in buying TransCare. For example, in February 2015, National Express offered to purchase TransCare's paratransit contract with the MTA for $15 to $18 million. JA271–72(85:9–86:14); JA1185–86. It followed up with another offer in July 2015 to buy the MTA contract for $6 to $7 million and to assume $2 million in liabilities. JA1203–04. In March 2015, Richmond County Ambulance Service expressed interest in purchasing all or part of TransCare at up to eight times its earnings before interest, taxes, depreciation, and amortization ("EBITDA"). JA1658. It repeated this offer in July 2015. JA1660. Tilton, however, prohibited her staff from speaking directly with any potential buyers. Indeed, when TransCare's chief executive officer, Glenn Leland, informed Tilton about the February 2015 offer, Tilton called him to her office and told him, "Don't ever [expletive] sell one of my companies." JA270–71(84:20–85:14); JA273(97:11–19).

TransCare's ongoing financial problems came to a head in July 2015. Wells Fargo announced that TransCare would not receive funding for its next payroll because it was in an over-advanced position on the

ABL. JA306. After TransCare missed payroll on July 3, *id.*, Tilton negotiated a deal with Wells Fargo to reopen the ABL, JA726–27(43:22–44:5). But TransCare's reprieve was short-lived.

In October 2015, Wells Fargo issued a notice of non-renewal, informing TransCare that the ABL would close on January 31, 2016. JA307. The notice directed TransCare to repay the outstanding balance of $13 million on its loan from Wells Fargo. JA605(159:19–22); JA2100–02. TransCare was not prepared to do so—in addition to the Wells Fargo debt, it also owed approximately $43 million on the term loan. JA468(93:7–19); SA29. Tilton directed her staff to prepare a budget that would change Wells Fargo's mind, but she eventually recognized that Wells Fargo would not reconsider unless she had a plan to sell TransCare. JA682(50:5–12).

In December 2015, Tilton and Wells Fargo agreed to extend the ABL to support the sale of TransCare. JA307; JA1326. Tilton would pay for critical operating expenses through another one of her companies, Patriarch Partners, LLC, JA1317–19, and she would hire a third-party financial advisor to help prepare a budget, JA307. Wells Fargo expected the sale of TransCare to close no later than August 15, 2016. JA1326.

8

Throughout that month, Tilton continued to receive inquiries about TransCare from potential buyers. National Express called several times to say that the offer to purchase the MTA contract was "still out there." JA1662–63. Tilton and her staff also received unsolicited phone calls from other interested buyers. JA1312. But Tilton did not pursue any of these opportunities.

In January 2016, pursuant to her agreement with Wells Fargo, Tilton retained the Carl Marks Advisory Group LLC to prepare a budget. JA307. Carl Marks's preliminary assessment noted that the weekly cash-flow was barely enough to cover payroll. JA1669–71. It explained that TransCare would "require a substantial amount of funding" to survive. JA1670.

On January 15, Tilton caused another one of her companies, Ark II CLO 2001-1, Limited ("Ark II"), to transfer $1.2 million to PPAS to make insurance payments on TransCare's behalf. JA2120–21. That afternoon, Michael Greenberg, a credit officer at Patriarch Partners, contacted Wells Fargo and explained that this funding was intended to be part of a new $6.5 million credit facility that would be secured by a blanket lien on TransCare's assets. JA1672–73. Greenberg proposed making this Ark II

lien subordinate to Wells Fargo's lien on the ABL priority collateral but senior to Wells Fargo's lien on the term loan priority collateral. JA1673. Wells Fargo responded that although it was open to a new source of funding, it was not willing to subordinate its lien. JA1672. Greenberg also pitched the same proposal to Credit Suisse, but he did not follow up with a formal plan because Tilton never directed him to do so. JA428(16:12–25); JA1718.

On January 27, following a more thorough review of TransCare's books, Carl Marks advised Tilton that TransCare was "operating at an absolute breaking point." JA1680–81. It predicted that Tilton would need to spend over $7.5 million to keep TransCare afloat, including $3.5 million over the next two weeks. JA1684. But it did not consider TransCare's situation to be hopeless. It provided Tilton with a turnaround plan that promised to put TransCare on the path to an operating revenue of over $100 million in 2016, with EBITDA of $4.97 million. JA1693. Tilton, however, rejected the plan because it would have required her to fund a "black hole." JA734–35(70:24–71:5).

Following another unsuccessful meeting with Carl Marks on February 5, Tilton embarked on a new strategy. JA696(64:1–16). She, her

staff, and TransCare's divisional chiefs put together a major restructuring plan that involved splitting TransCare into two groups of entities called "OldCo" and "NewCo." Under this plan, PPAS, acting as the administrative agent for the term loan lenders, would foreclose on part of the term loan priority collateral and seize TransCare's profitable business divisions. It would then sell those divisions to NewCo, which would operate them as a going concern. Meanwhile, OldCo, now left holding TransCare's failing divisions, would file for bankruptcy. JA697(65:3–16).

Tilton began to implement this plan. On February 10, she created two new Delaware corporations that would serve as NewCo: Transcendence Transit, Inc. and Transcendence Transit II, Inc. (collectively, "Transcendence"). JA303; JA307; JA2189–96. She appointed herself the sole director of both entities. JA303. She also secured a new source of funding for TransCare by implementing the $6.5 million credit facility with Ark II that she had previously pitched to Wells Fargo and Credit Suisse. SA23–24; JA1357–58. The new credit facility was secured by a lien on TransCare's assets, and Ark II signed an intercreditor agreement with PPAS that gave it priority over the term loan lenders. SA24; JA1392; JA1395–96; JA1411. Although the agreements for the credit facility and

11

the lien priority were executed on either February 10 or 11, they were backdated to January 15. JA305. Credit Suisse and First Dominion Funding, the two largest term loan lenders not under Tilton's control, were not informed about these agreements.

Outside of her small circle of staff and TransCare leadership, Tilton informed few people of her OldCo/NewCo plan. She described a version of her plan to Wells Fargo on February 9 while attempting to convince it to over-advance funds through the ABL, and she asserts that she continued to share financial models with Wells Fargo up until the execution of her plan. JA699(67:10–16). But there is no evidence that Wells Fargo ever consented to the plan or that Tilton informed it about the timing or other details. SA64–65; SA124 n.78. Nor is there any evidence that Tilton informed Credit Suisse, the largest of the term loan lenders not under her control. SA64–65; SA124 n.79.

Indeed, Tilton did more than simply fail to inform Credit Suisse about her plan; she actively misled it. SA124. On February 11, Tilton dictated an email sent by Greenberg to Credit Suisse that blamed Credit Suisse for refusing to subordinate its interests for the new $6.5 million

credit facility. JA434 (33:14–17); JA1866. She told Credit Suisse that, because of its refusal, TransCare would be forced to file for bankruptcy. JA1866. What she failed to mention was that TransCare had already signed an agreement for a new $6.5 million credit facility and PPAS had signed an intercreditor agreement that subordinated Credit Suisse's interests.

Over the next two weeks, Tilton and her staff continued to execute her restructuring plan. They put together a "Transcendence Go Forward Model" that laid out a plan for Transcendence to operate TransCare's paratransit, Hudson Valley, Pennsylvania, Maryland, Westchester, and Bronx 911/Montefiore 911 divisions. JA2012–13. They also attempted to obtain insurance for Transcendence by reaching out to TransCare's brokers. JA1438; JA1736–37. Tilton explained to one of those brokers that her plan was to continue "a smaller, less risky transit business" in "a new company." JA1438. She committed to funding the new company with her own money, explaining: "It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally." *Id.*

Meanwhile, TransCare suffered a major setback on February 19 when it lost its contracts with Bronx Lebanon, Montefiore hospital, and the University of Maryland. SA28; JA2203. According to Tilton, the loss was a "big hit," JA760(99:18–20), and TransCare was "unraveling by the minute," JA2203. Nevertheless, Tilton and her staff continued to press forward with the plan. Their projections as of February 23 indicated that Transcendence's operating revenue for the remainder of 2016 would be $37 million, with EBITDA of $3.2 million. JA1831; JA1835.

On Wednesday, February 24, just after securing insurance for Transcendence, Tilton and her staff executed the foreclosure and sale. JA645(6:16–19). At 12:07 a.m., PPAS notified TransCare that it was in default and that PPAS would be foreclosing on certain TransCare assets—the "subject collateral"—in satisfaction of $10 million out of the total $43 million on the term loan. JA1474–76; SA29. The subject collateral included all of TransCare's personal property, the MTA contract, and the stock of three TransCare divisions: TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc, and TC Ambulance Corp. JA1479. It differed from the Transcendence Go Forward model in that it did not include

14

the stock of the TransCare divisions that had recently lost their contracts. Nor did it include the accounts receivable and the certificates of need (CONs) that were required to operate the ambulances. SA29–30 & n.15. Later that morning, PPAS sold the subject collateral to Transcendence for $10 million. JA1602. That evening, TransCare and its remaining subsidiaries filed Chapter 7 bankruptcy petitions. JA308–09.

On Thursday, February 25, Salvatore LaMonica was appointed the bankruptcy trustee for the TransCare estate. JA309. That morning, at a meeting with TransCare's stakeholders, a representative from PPAS informed the trustee that PPAS had conducted a strict foreclosure the day before that encompassed all of TransCare's physical assets, including ambulances that were still on the road. JA586(133:1–21); JA587–88(134:2–10, 134:15–21, 135:3–6). The trustee, however, still owned the CONs required to operate the ambulances. JA588(135:20–25). The PPAS representative told the trustee that TransCare could continue to use the ambulances so long as the trustee reached an agreement with Tilton and Transcendence. JA587(134:19–21); JA589(136:1–3).

But there was a bigger obstacle to keeping the ambulances on the road: paying the drivers. Payday for the previous two weeks was scheduled for the next day, and TransCare had $1.2 million in payroll obligations. JA591(138:2–11). Wells Fargo was willing to fund $800,000, and PPAS would provide another $200,000, but those commitments still left TransCare $200,000 short. *Id.* The trustee made clear that he would not operate TransCare unless he could pay the employees, but neither Tilton (through PPAS) nor Wells Fargo was willing to provide more money. JA592(139:4–10).

On Friday, February 26, the trustee visited TransCare's corporate headquarters. JA598(145:10–12). There, he found the president of Transcendence attempting to take possession of a computer server that was purportedly vital to Transcendence's operations. *Id.* (145:10–20); JA661(26:6–9, 26:17–21). The trustee refused to surrender the server to Transcendence because it contained TransCare's financial books and records. JA610–11(165:22–166:4).

Later that day, a representative from PPAS contacted the trustee about the MTA contract. JA1609–10. He asked if the trustee would be willing to terminate the contract to clear the way for a new agreement

16

between the MTA and Transcendence, and he said that he needed an answer by 5 p.m. *Id.* After attempting to call the PPAS representative several times, the trustee sent an email at 5:07 p.m. stating that he had "no problem terminating the contract as long as it is without prejudice to the amount due to Transcare under the contract." JA1609. But the trustee's consent ultimately made no difference because, at 7:01 p.m., PPAS emailed the MTA to inform it that Tilton had decided that Transcendence would not be able to provide services under a short-term contract. JA1862. Tilton abruptly decided to shut down Transcendence's operations and issued a termination notice to the employees. JA1863; SA35–36. Her chaotic attempt to make a seamless transition from TransCare to Transcendence ended instead in abject failure after fully operating for only three days. SA32–35.

On March 10, PPAS and Transcendence transferred the subject collateral to the trustee "free and clear of any and all liens, claims, encumbrances, interests or adverse claims to title." JA1894. On April 25, the TransCare subsidiaries that had been part of the subject collateral filed for bankruptcy, and LaMonica was appointed as the trustee. JA310.

17

The trustee liquidated TransCare's property, including the subject collateral, for approximately $19.2 million. JA555(13:10–14). Approximately $11.7 million of those proceeds were attributable to the CONs, $5.6 million were attributable to the accounts receivable, and $2 million were attributable to the physical assets. JA2009. Neither the CONs nor the accounts receivable were included in the subject collateral. SA67. From the $2 million recovered from the physical assets, the trustee paid $800,000 to PPAS; therefore, the liquidation value of the subject collateral to the TransCare estate was $1.2 million. JA310; SA67.

Using the proceeds from the liquidation, the trustee reimbursed Wells Fargo in full for the outstanding balance of $13 million on the ABL. Tilton's companies—PPAS, Patriarch Partners, Patriarch Partners Management Group, LLC, and Ark II—did not recover the full amounts of their loans to TransCare. So in October 2017, they filed proofs of claim against the TransCare estate, including a demand for $35 million from PPAS. JA310.

In February 2018, the trustee initiated adversary proceedings against Tilton and her companies in the Bankruptcy Court for the South-

18

ern District of New York. JA84. The allegations were eventually narrowed down to one non-core claim and nine core claims. SA38–40. The non-core claim alleged that Tilton breached her fiduciary duties of loyalty and good faith under Delaware law. SA38. The core claims included allegations that the foreclosure and sale of the subject collateral for $10 million constituted an actual fraudulent transfer under federal and New York law and that the lien granted to Ark II was either a constructive fraudulent transfer or a preferential transfer. SA38–39.

### B. Procedural History

#### 1. Bankruptcy Court Proceedings

The bankruptcy court conducted a six-day bench trial between July 22 and August 14, 2019. SA39. It heard live testimony from the trustee, Tilton, Greenberg, and two other employees of Tilton. *See* JA256; JA374; JA483; JA507; JA643. It also heard from the trustee's damages expert, Dr. Jonathan Arnold, and from the defendants' rebuttal expert. JA549; JA615.

Tilton testified as to how she decided on the price of $10 million for the subject collateral. Using TransCare's closing balance sheet for December 2015 and the going-forward projections for the divisions that were

supposed to become NewCo, she calculated the book value[1] of those divisions to be $9,996,000.60. JA765–67(104:23–106:10). That figure, which she rounded up to $10 million, included the value of the accounts receivable that she intended to purchase from Wells Fargo. JA768–69(107:8–108:3). Tilton, however, ultimately did not purchase the receivables. JA769(108:4–9). She testified that removing the receivables from her calculations reduced the book value of the subject collateral from $10 million to $1.7 million. *Id.* (108:10–16).

The trustee's damages expert, Dr. Arnold, testified as to the range of values that Tilton could have reasonably expected to obtain for the sale of the subject collateral in a fair, open-market transaction. JA549(7:9–12). His analysis relied on financial projections from January and February 2016, as well as research that Greenberg had conducted for Tilton in December 2015 on comparable companies and transactions. JA1963–69; JA1972(¶ 67 n.75); JA1973(¶ 68 n.79). He concluded that the implied

---

[1] "Book value" is "[t]he value at which an asset is carried on a balance sheet." *Book Value*, Black's Law Dictionary (11th ed. 2019). It is contrasted with "going-concern value," which is "[t]he value of a commercial enterprise's assets or of the enterprise itself as an active business with future earning power," and "liquidation value," which is "[t]he value of a business or of an asset when it is sold in liquidation." *Value*, Black's Law Dictionary.

value of the subject collateral was between 7.1 and 12.2 times the projected EBITDA of Transcendence. JA2004.

In July 2020, the bankruptcy court issued a comprehensive opinion that resolved the core claims and made recommendations as to the non-core claim. SA1. Beginning with the non-core claim, it recommended that the district court find Tilton liable for breaching her fiduciary duties of loyalty and good faith. SA54. Although Tilton's decisions before her restructuring plan were protected by the business judgment rule, her decisions involving the foreclosure and sale of the subject collateral were not. SA43. Because Tilton stood on both sides of that transaction, she bore the burden under Delaware law of proving the "entire fairness" of the transaction. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). To satisfy that burden, she had to prove both that the transaction was the product of fair dealing and that it resulted in a fair price. *Id.* at 711.

The fair-dealing inquiry is concerned with ensuring that a fair process is in place to guarantee arm's-length bargaining. SA46. The bankruptcy court reasoned that "[t]here was nothing fair about the process through which Tilton effectuated" the foreclosure and sale to Transcendence. SA48. She "stood on every side of the transaction and controlled

21

every aspect of the transaction with neither negotiation nor oversight nor approval by an unconflicted person." SA48–49.

The fair-price inquiry is concerned with whether the transaction was in a range of fairness that a reasonable seller would accept. SA50. The bankruptcy court determined that Tilton could not carry her burden of showing fair price because the unfair process by which the transaction had been negotiated had tainted the price. SA51–52. Even if there had been a fair process, the bankruptcy court determined that Tilton's use of book value—as opposed to going-concern value—had undervalued the subject collateral. SA53–54. Finally, even if book value were the appropriate measure of value, the calculation of $10 million was riddled with "patent errors" that still undervalued the subject collateral. SA53. For example, the foreclosure had included all of TransCare's physical assets—not just the assets of those divisions that were slated to become NewCo—but the calculation of $10 million did not include the property of the OldCo business divisions. *Id.* In addition, even though the CONs were not part of the subject collateral, the bankruptcy court concluded that they added value to the stock of the business divisions and should have been included in Tilton's valuation. *Id.* Because Tilton could show

neither fair price nor fair dealing, she could not carry her burden of proving the entire fairness of the transaction, and she was therefore liable for breaching her fiduciary duties.

Having determined Tilton's liability, the bankruptcy court recommended that the district court award $41.8 million in damages to the trustee. SA71. In reaching this figure, the court started with Transcendence's projected EBITDA, which Tilton's staff had calculated in late February 2016 to be $3.2 million for the rest of the year. SA59. According to Tilton's testimony during the trial, that figure increased to $4 million in a full-year projection. *Id.* The court then turned to Dr. Arnold's testimony about the range of EBITDA multiples that could be used to estimate Transcendence's implied value, and it selected the higher intermediate multiple, 11x EBITDA. SA59–64. Applying the 11x multiple to the $4 million projected EBITDA yielded $44 million. SA65. Next, the court subtracted from that figure $1 million for the working capital that a buyer would have been expected to invest in NewCo. SA65–67. Finally, it subtracted another $1.2 million for the proceeds that the trustee recovered in the liquidation of the subject collateral. SA67.

The bankruptcy court next turned to the core claims and found that the foreclosure and sale of the subject collateral by PPAS and Transcendence constituted an actual fraudulent conveyance. SA76. Under both federal and New York law, a conveyance or transfer is intentionally fraudulent when the debtor makes the transfer with the actual intent to hinder, delay, or defraud a present or future creditor. *See* 11 U.S.C. § 548(a)(1)(A); N.Y. Debt. & Cred. Law § 276[2]; SA72. Fraudulent intent can be proven if the plaintiff proves the existence of certain "badges of fraud," such as lack or inadequacy of consideration and a close relationship among the parties. *See In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983); SA73–74. The bankruptcy court found that "[v]irtually all of the badges of fraud" were present, which "provid[ed] strong circumstantial evidence of Tilton's fraudulent intent." SA74.

For damages for the actual fraudulent conveyance, the bankruptcy court concluded that the trustee was entitled to recover $39.2 million. *See* 11 U.S.C. § 550(a); SA79. It multiplied the projected 2016 EBITDA of $4 million by the average EBITDA multiple of 10.1x, then it subtracted $1.2

---

[2] All citations to the New York Debtor and Creditor Law are from the version in effect at the time of the fraudulent transfer.

million for the liquidation value of the subject collateral. SA77–79. Because the damages for the fraudulent conveyance remedied the same injuries as the damages for the breach of fiduciary duties, the bankruptcy court explained that the trustee was entitled to only a single satisfaction. SA79.

The bankruptcy court then turned to the claims involving the lien that was granted to Ark II in connection with the $6.5 million credit facility. SA80. It concluded both that the lien was an avoidable preference under the Bankruptcy Code, *see* 11 U.S.C. § 547(b), and that it was a constructive fraudulent transfer under the New York Debtor and Creditor Law, *see* N.Y. Debt. & Cred. Law § 273; SA80–88. As a remedy for these violations, the bankruptcy court avoided the lien and preserved it as a benefit for the estate. *See* 11 U.S.C. § 551; SA86; SA88. Finally, the bankruptcy court dismissed the trustee's remaining claims. SA90–91; SA95; SA97–99.

### 2. District Court Proceedings

Tilton filed an objection to the bankruptcy court's proposed findings and conclusions on the non-core claim, and PPAS, Patriarch Partners, Patriarch Partners Management Group, and Transcendence (collectively,

the "Patriarch entities") appealed the findings and conclusions on the core claim. Ark II did not appeal the judgment setting aside its lien on TransCare's assets. In September 2021, the district court issued an opinion that largely upheld the bankruptcy court's decisions. SA103.

On the non-core claim against Tilton, the district court adopted the bankruptcy court's recommendation as to liability. SA121. It agreed that the transaction was not the product of fair dealing, "especially given the total lack of negotiations and protections for those unaffiliated with Tilton." SA127. It also agreed that $10 million was not a fair price for the subject collateral. SA127–31.

The district court modified the recommended damages award for the non-core claim by reducing it to $38.2 million. SA131. Although it generally agreed with the bankruptcy court's methodology, it concluded that using the average multiple of 10.1x was more reasonable than using the higher intermediate multiple of 11x. SA137–38. Applying the same analysis as the bankruptcy court, it multiplied the projected EBITDA of $4 million by 10.1x, then subtracted $1 million for the buyer capital investment and $1.2 million for the liquidation value of the subject collateral, to arrive at $38.2 million. SA138–39.

On the core claim, the district court determined that the bankruptcy court did not clearly err in concluding that the transaction was an actual fraudulent conveyance and that the trustee was entitled to $39.2 million in damages. SA139–140. It recognized the "overwhelming circumstantial evidence" that Tilton acted with the intent to hinder or delay TransCare's creditors. SA144. And it found no error in the bankruptcy court's use of the 10.1x multiple or the reduction of $1.2 million. SA147.

## SUMMARY OF ARGUMENT

**I.** The courts below correctly determined liability.

**A.** The district court correctly held that Tilton breached her fiduciary duties to TransCare. Because Tilton stood on both sides of the transaction, under Delaware law she bore the burden of proving "entire fairness," *Weinberger*, 457 A.2d at 710, which required her to show that she engaged in fair dealing and paid a fair price, *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007). Tilton did not engage in fair dealing when she sold the subject collateral to herself at a price that she fixed without even attempting to find a third-party buyer. And $10 million was not a fair price because it significantly undervalued the subject collateral.

27

**B.** The bankruptcy court correctly determined that Tilton's companies conducted an actual fraudulent conveyance under federal and New York law because Tilton—whose intent is imputed to her companies—acted with the intent to hinder, delay, or defraud TransCare's creditors. 11 U.S.C. § 548(a)(1); N.Y. Debt. & Cred. Law § 276. The finding that Tilton had actual fraudulent intent is reviewed for clear error. Fraudulent intent may be proven with "badges of fraud," which are circumstances so closely associated with fraudulent conveyances that their presence creates an inference of fraudulent intent. The bankruptcy court did not clearly err in finding that virtually all of the badges of fraud were present.

**II.** The courts below correctly determined damages.

**A.** The district court did not commit clear error in calculating the damages for Tilton's breach of her fiduciary duties. Tilton selected the specific TransCare divisions that were included in the subject collateral because she knew they had going-concern value. And those divisions lost value as a direct consequence of her misconduct. The trustee is entitled to recover from Tilton damages amounting to that lost going-concern value.

**B.** The bankruptcy court did not commit clear error in calculating the damages for the actual fraudulent conveyance. The Bankruptcy Code authorizes the trustee to recover the going-concern value of the subject collateral at the time of the fraudulent conveyance. Because the Patriarch entities had previously returned the subject collateral to the trustee for liquidation, the bankruptcy court subtracted the liquidation value from the going-concern value when calculating damages.

## STANDARD OF REVIEW

In an appeal from a district court's judgment in a non-core bankruptcy proceeding, this Court reviews the district court's findings of fact for clear error and its conclusions of law *de novo. Cf. Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 26 (2d Cir. 2002).

In an appeal from a bankruptcy court's judgment in a core proceeding, the district court acts as an appellate court. *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999). Consequently, this Court examines the bankruptcy court's decision "independently," reviewing the findings of fact for clear error and the conclusions of law *de novo. In re Enron Corp.*, 419 F.3d 115, 124 (2d Cir. 2005).

## ARGUMENT

### I. The District Court and the Bankruptcy Court Correctly Determined Liability.

The trustee prevailed in both courts below on two separate theories of liability. First, in the non-core proceeding, the district court found that Tilton breached her fiduciary duties of loyalty and good faith. Second, in the core proceeding, the bankruptcy court found that the foreclosure and sale of the subject collateral constituted an actual fraudulent conveyance. Both judgments are reviewed for clear error and should be affirmed.

### A. The District Court Correctly Determined that Tilton Breached her Fiduciary Duties to TransCare.

As the owner of TransCare, PPAS, and Transcendence, Tilton stood on all sides of the foreclosure and sale of the subject collateral. Because she owed fiduciary duties of loyalty and good faith to TransCare and its shareholders, it was incumbent upon her to ensure that the transaction was negotiated in a fair manner and that the subject collateral was purchased at a fair price. She failed completely.

Because TransCare and its subsidiaries were incorporated in Delaware, the claim against Tilton for breaching her fiduciary duties is governed by Delaware law. *Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir. 1962); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 346–47 (Bankr. S.D.N.Y.

2010). Under Delaware law, self-dealing transactions are presumptively unlawful. *Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001). To avoid liability, a corporate director standing on both sides of a transaction must establish the transaction's "entire fairness." *Weinberger*, 457 A.2d at 710.

Entire fairness is "Delaware's most onerous standard." *In re Opus E., LLC*, 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd*, No. 15-346-GA, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017). It is "so exacting that it ordinarily, but not invariably, results in a finding of liability." *Pereira*, 267 B.R. at 508 (quoting *Solomon v. Armstrong*, 747 A.2d 1098, 1138 n.39 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000)). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011).

Entire-fairness review "has two components: fair dealing and fair price." *Valeant Pharms. Int'l*, 921 A.2d at 746. These components "are not independent, but rather the fair dealing prong informs the court as to the fairness of the price obtained through that process." *Id.* A court "must evaluate a transaction as a whole." *William Penn P'ship v. Saliba*, 13 A.3d 749, 757 (Del. 2011).

Tilton does not dispute that the foreclosure and sale of the subject collateral constituted a self-interested transaction and that she has the burden of proving entire fairness. She argues only that this transaction is one of those rare exceptions that satisfies the entire-fairness standard. But both the bankruptcy court and the district court correctly concluded otherwise. And in this third review of the facts, Tilton presents no argument that would justify a different result.

### 1. Tilton Failed to Prove Fair Dealing.

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Here, the district court agreed with the bankruptcy court that "there was nothing fair about the process through which Tilton effectuated the foreclosure and sale of the Subject Collateral." SA123 (alteration in original) (internal quotation marks omitted). "Tilton stood on every side and controlled every aspect of the transaction." SA124 (internal quotation marks omitted). She sold the subject collateral to herself at a price that she fixed. She did not institute any procedural protections, such as appointing a special committee of the

board or obtaining the consent of disinterested shareholders. Nor did she negotiate with or even inform TransCare's other shareholders about her plan, including TransCare's next largest shareholder, Credit Suisse. And she never explored outside options or "considered any alternative other than selling the Subject Collateral … to herself." SA124–25.

Tilton attacks the lower courts' analysis of fair dealing by distorting the record in at least four ways. She asserts that she demonstrated "candor" by keeping essential stakeholders informed. Appellants' Br. at 48. Additionally, she states that she showed "consideration of and attentiveness to" the advice of Carl Marks. *Id.* She also contends that she intended to benefit the term loan lenders by giving them approximately 45 percent of TransCare's equity. *Id.* at 49. Finally, she argues that even though she kept Credit Suisse in the dark, that fact is irrelevant because the transaction "did not require Credit Suisse's consent." *Id.* at 50.

Tilton's discussions with key stakeholders were anything but candid. She indisputably left Credit Suisse "in the dark" about her plan. SA124 n.78. And although the record suggests that she did keep Wells Fargo somewhat informed with wind-down budgets and models, Wells Fargo was not a participant in the planning process and had no role in

the timing of the foreclosure or the selection of the price. *Id.* Describing such behavior as candid is, as the district court put it, "misleading[]." *Id.*

It is also misleading—not to mention irrelevant—to assert that Tilton considered and was attentive to the advice of Carl Marks. As the district court put it, "Carl Marks indisputably was not hired to find a buyer or investor." SA125 n.80 (cleaned up). It was hired to prepare a budget that would be acceptable to Wells Fargo and would keep Trans-Care afloat until Tilton found a willing third-party buyer. JA307. Whether Tilton was attentive to Carl Marks's budgetary advice has no relevance as to whether she engaged in fair dealing. And even if it were relevant, Tilton hardly showed "consideration" or "attentiveness" when she dismissed Carl Marks's advice and developed her own plan with no outside input.

Tilton's assertion that she intended to allocate almost half of Transcendence's equity to the term loan lenders is equally irrelevant and is not supported by the record. Whether Tilton intended ultimately to benefit the creditors has no bearing on whether she engaged in fair dealing. But even if Tilton's assertion about her subjective good-faith intent were relevant, the only evidence to support it—other than her own self-serving

testimony, JA770–73(116:5–119:19)—is a draft spreadsheet shared in an email between two employees at Patriarch Partners, JA1820–23. And at the trial, two of Tilton's senior advisers at Patriarch Partners testified that they did not know how Tilton planned to allocate Transcendence's equity. JA438–39(44 :21–45:6); JA515–17(24:17–26:8).

Finally, Tilton did more than simply not inform Credit Suisse about the foreclosure; she actively misled it. She secretly caused PPAS to sign an intercreditor agreement with Ark II that purported to subordinate Credit Suisse's interests. Then she dictated an email to Credit Suisse in which she pretended that this agreement had not been signed and that Credit Suisse's refusal to subordinate its interests was responsible for TransCare's bankruptcy. Whether Credit Suisse's consent was necessary does not change the fact that Tilton engaged in a brazen act of deception and gaslighting with one of TransCare's largest shareholders.

Besides distorting the record, Tilton also attacks the lower courts' reasoning by arguing that no third party would have been willing to buy the subject collateral in February 2016. Appellants' Br. at 50–51. But TransCare's dire condition as a whole did not mean "that a strategic

third-party would not have been willing to buy certain of its more profitable and 'less risky' business lines at that time, even if such a transaction called for a condensed timeline and/or minimal due diligence," which is what the district court found. SA126. Moreover, Tilton's insistence that no reasonable buyer would have thought that the subject collateral had value is difficult to square with the fact that she clearly thought that Transcendence had a future. Indeed, she testified that her restructuring plan was "the only scenario under which [she] was willing to put in new money because it would have been money going into a company with a future." JA739(78:8–10).

Tilton further argues that it would have been "redundant" for her to consider selling the subject collateral to third-party buyers in February 2016 because she had already considered and rejected those options. Appellants' Br. at 49–50. But Tilton never explored a sale to a third party of the specific divisions that were included in the subject collateral; at most, she considered selling only TransCare as a whole. As she admits in her opening brief, she ignored the earlier offers because the interested buyers were not willing to pay "a price that would have covered both Wells and the term loan lenders." *Id.* at 10 (quoting JA679–80(47:22–

48:3)). In February 2016, Tilton finally recognized that this goal was infeasible and that her best option was to sell the more profitable divisions while allowing the rest of the company to proceed through bankruptcy. When she finally came to this realization, she made no effort to sell those profitable divisions to anyone but herself.

Tilton's conflation of the value of TransCare as a whole with the value of the specific business lines included in the subject collateral reduces to a logical fallacy of division. That fallacy "is committed when one argues that what is true of a whole must also be true of its parts." *Rosen v. Unilever U.S., Inc.*, No. C 09-02563 JW, 2010 WL 4807100, at *6 (N.D. Cal. May 3, 2010). It is like arguing that because a five-course meal was mediocre, the dessert course must necessarily have been subpar. In reality, the dessert might have been phenomenal, while the bland appetizer and overcooked entrée ruined the overall dinner. A returning customer would be reluctant to repeat the dining experience, but she would certainly be willing to reorder the dessert à la carte and in a to-go box.

So here, that TransCare as a whole was insolvent does not mean that the business lines included in the subject collateral lacked value. As

the district court explained, Tilton's argument "conflates a sale of Trans-Care as a whole—which no one disputes was infeasible at the time of the foreclosure—and a sale of the discrete business lines that Tilton herself selected as having future value." SA126. That a willing third-party buyer was not willing to make an offer for TransCare that would satisfy Tilton does not mean that the buyer would not have paid a competitive price for TransCare's more profitable business divisions.

Finally, Tilton argues that she did not need to show fair dealing because TransCare was on its deathbed. She cites *In re Trados Inc. Shareholder Litigation*, 73 A.3d 17 (Del. Ch. 2013), for the proposition that, when a business has "no future" and the defendant shows that there was "no better alternative" to the self-interested transaction, then fair price alone establishes entire fairness. Appellants' Br. at 36–37.

Tilton's argument fails because *Trados* does not establish a "get out of jail free" card. Under Delaware law, "[s]elf-dealing transactions are improper regardless of whether or not the corporation is solvent." *Pereira*, 267 B.R. at 511. *Trados* stands for the narrow proposition that, if a company's common stock had no economic value before a merger, and if the merger yielded nothing for the common stockholders, "then the common

stockholders received the substantial equivalent in value of what they had before," and the merger therefore "satisfies the test of fairness." 73 A.3d at 76. That situation does not apply here, where the subject collateral had substantial value as a going concern and the self-interested transaction deprived TransCare's creditors and shareholders of value that they would have acquired had Tilton participated in a fair and transparent sales process.

Even under Tilton's interpretation of *Trados*, her argument fails on its own terms because she did not show "no future" and "no better alternative." She failed to show no future because the TransCare business divisions sold to Transcendence in the subject collateral had future value as a going concern. Tilton acknowledged as much when she told a potential insurer that Transcendence would be "a profitable, lower risk transit company that would still employ over 1000 of our workers." JA1438. To the extent that Tilton's argument about "no future" is an assessment of TransCare as a whole, she is (again) employing the fallacy of division.

Tilton failed to show "no better alternative" because she never explored any option that she did not totally control. She repeatedly forbade her staff from speaking with interested buyers or exploring alternative

sources of funding. *See* JA263–64(77:2–78:20); JA273(97:11–19); JA277(101:13–20); JA282–83(148:24–149:3); JA479(123:7–12). And she never pursued any of the numerous offers to buy all or part of TransCare.

In support of her argument that there was "no better alternative," Tilton argues that the companies that expressed interest in buying TransCare were not "willing to pay anything remotely close to going-concern value." Appellants' Br. at 40. But she misleadingly describes these offers as "significantly reduced" and "significantly undervalued." *Id*. National Express was interested in buying the MTA business and suggested an immediate purchase price of $14 to $18 million. JA1191. And Richmond County Ambulance was interested in purchasing TransCare and proposed a valuation of $60 to $80 million. JA1192. Both these offers were significantly larger than the $10 million she eventually paid herself.

The cases that Tilton cites in support of her "no better alternative" argument are inapposite. For example, she cites *Oberly v. Kirby*, 592 A.2d 445 (Del. 1991), to argue that she was not required to explore alternative transactions given the obvious drawbacks of a third-party sale. Appellants' Br. at 39. But *Oberly* stands for the proposition that a director's

failure to explore alternative possibilities to a transaction does not necessitate a finding of unfair dealing when other procedural protections were in place, such as "lengthy, vigorous and arm's length" negotiations. *Oberly*, 592 A.2d at 470. Here, there were no such protections in place when Tilton sold the subject collateral to herself. *Oberly* does not let Tilton off the hook.

Tilton also cites the *New Haven Inclusion Cases* for the proposition that, where a company has "past deficit operations" and "bleak prospects for the future," it "is not realistic to assume that a potential buyer would pay the liquidated value of [its] assets." 399 U.S. 392, 482 (1970); *see* Appellants' Br. at 40. But the language that Tilton quotes is a decision of the Interstate Commerce Commission that the Supreme Court quoted approvingly, not a part of the Court's holding. The *New Haven Inclusion Cases* did not establish a rule that a company with past deficit operations and bleak prospects for the future is worth only liquidation value. It stated merely that bondholders could not treat a railroad "as a liquidating enterprise with respect to certain [assets] and as an operating railroad with respect to others, depending on which approach happens to

41

yield the higher value," because that approach would allow the bondholders "to have the best of both worlds." *New Haven*, 399 U.S. at 482. Here, the only person trying to have it both ways is Tilton, who led potential insurers to believe that the business divisions in the subject collateral had going-concern value, sold the divisions to herself at book value, and now argues that they were worth only liquidation value all along.

### 2. Tilton Failed to Prove Fair Price.

"[T]he fair price aspect of an entire fairness analysis requires [a corporate director] to demonstrate that the price offered was the highest value reasonably available under the circumstances." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted). A court conducting a fair-price inquiry "asks whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'" *Reis*, 28 A.3d at 466 (quoting *Cinerama*, 663 A.2d at 1143). Because the entire fairness standard is unitary, unfair dealing may "taint[] the entire transaction" and cause it to fail entire-fairness review, even if the "price was in the range of fairness." *William Penn*, 13 A.3d at 758.

Both courts below correctly determined that Tilton failed to carry her burden of showing fair price for three independent reasons. First, Tilton's unfair dealing tainted the transaction, which means that she cannot satisfy the unitary standard of entire fairness. SA128. Tilton does not challenge this reasoning; indeed, she emphatically agrees that the entire-fairness inquiry is unitary. Appellants' Br. at 37. Her only responsive argument is that she engaged in fair dealing. *Id.* at 47. But, as explained by both courts below, Tilton employed a "tainted process," SA128, which makes it impossible for her to satisfy entire-fairness review.

Second, even if the process had been fair, the price was not because Tilton dramatically undervalued the subject collateral by using book value instead of going-concern value. SA128–29. Book value is "not ordinarily an accurate reflection of the market value of an asset." *In re Roblin Indus., Inc.*, 78 F.3d 30, 36 (2d Cir. 1996). It "tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations." *Reis*, 28 A.3d at 476. The TransCare divisions included in the subject collateral had going-concern value,

which Tilton admitted when she told a potential insurer that she intended to operate those divisions through Transcendence "on a go forward basis." JA2012.

Tilton argues that going-concern value is not the correct measure of value because TransCare was on the "brink of bankruptcy" and therefore was worth no more than liquidation value. Appellants' Br. at 42. But that TransCare as a whole might have been on its deathbed does not prove that the divisions included in the subject collateral were in the same position. Moreover, it is obviously false that no buyer would have been willing to pay more than liquidation value—Tilton paid $10 million, more than eight times the liquidation value of $1.2 million.

Third, even if book value were the appropriate means of valuation, $10 million would still undervalue the subject collateral. Tilton conceded that her calculation excluded at least $2.45 million in physical assets that were part of the foreclosure but were not intended for operation by Transcendence. SA130. She also did not account for the value of the two CONs belonging to the TC Hudson Valley and TC Ambulance Corp. divisions, which were liquidated for $3.2 million. *Id*. Although these CONs were not

included in the foreclosure and never became the property of Transcendence, they did add value to the stocks of their respective divisions, which were part of the subject collateral. *Id.* Finally, she ascribed no value to the MTA contract, which took in at least $25 million in annual revenue and which third parties had offered to purchase for $6 to $18 million.

Tilton argues that the district court clearly erred by considering the value of the CONs and the MTA contract in its fair-price assessment. Appellants' Br. at 45–46. With respect to the CONs, she argues that TC Hudson Valley and TC Ambulance Corp. were both defunct companies, so their stock had no value; it was therefore clear error for the district court to speculate that the CONs would have increased the stock of these companies. *Id.* at 46. As for the MTA contract, she argues that liquidation value, not going-concern value, is the appropriate means of valuing the contract, and the liquidation value of the contract was $0. *Id.*

Neither argument has merit. First, regarding the CONs, Tilton yet again mistakenly equates the value of TransCare as a whole with the value of its business divisions. Although TransCare as a whole might have been doomed to inevitable bankruptcy, the divisions included in the subject collateral were not. The stocks of these divisions had value, and

it was not clear error for the district court to conclude that the CONs would have raised that value even higher. Second, regarding the MTA contract, of course a contract will have no going-concern value if the parties to it are no longer in business, which is what occurred after Tilton declined to continue providing services under the contract and fired Transcendence's employees. But the TransCare divisions sold to Transcendence as part of the subject collateral were still in business and had going-concern value at the time of the transaction, and Tilton intended for these divisions to take over the contract. It was not clear error for the district court to conclude that Tilton should have paid more than $0 for a contract that brought in $25 million a year.

Ultimately, Tilton bore the burden of proving entire fairness. Both courts below determined that she failed to meet that burden. Tilton can point to no error, much less clear error, in those conclusions.

### B. The Bankruptcy Court Correctly Determined that the Transaction Was a Fraudulent Conveyance.

Both courts below concluded that the conduct surrounding the foreclosure and sale of the subject collateral met the criteria for a fraudulent conveyance under both federal and New York Law. Tilton used PPAS, an entity that she controlled, to foreclose on the subject collateral without

informing Credit Suisse or the other term loan lenders. She then sold the subject collateral to Transcendence—another entity that she controlled—at a price that she fixed and that significantly undervalued the subject collateral. At the end of the transaction, Tilton retained control of the subject collateral through her interest in Transcendence, which was now "free and clear" of the term loan lenders' lien as a result of the foreclosure and sale of TransCare's assets. SA75. The entire transaction was planned and executed within 14 days, and only a small group of Tilton's staff was included in the process.

Federal and New York law have similar definitions of fraudulent conveyances. Under the Bankruptcy Code, a fraudulent conveyance is "any transfer" of property by the debtor that is done "with actual intent to hinder, delay, or defraud" its creditors. 11 U.S.C. § 548(a)(1). Under the New York Debtor and Creditor Law, a fraudulent conveyance is a "conveyance made" or "obligation incurred with actual intent … to hinder, delay, or defraud either present or future creditors." N.Y. Debt. & Cred. Law § 276. If a conveyance is fraudulent under New York law, it is also fraudulent under federal law. *See In re Manshul Constr. Corp.*, No. 96B44080(JHG), 2000 WL 1228866, at *43 n.7 (S.D.N.Y. Aug. 30, 2000).

The party seeking to set aside the fraudulent conveyance has the burden of proving "actual intent" to hinder, delay, or defraud. *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). Because "[f]raudulent intent is rarely susceptible to direct proof," *Kaiser*, 722 F.2d at 1582, a trustee "may rely on 'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent," *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 160 (2d Cir. 2021). These badges include a "lack or inadequacy of consideration"; a "close associate relationship between the parties"; and "the retention of possession, benefit or use of the property in question." *Kaiser*, 722 F.2d at 1582–83. The "shifting of assets by the debtor to a corporation wholly controlled by him" is also a badge of fraud, *id.* at 1583, as are circumstances suggesting the "secrecy, haste, or unusualness of the transaction," *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995), and "the concealment of facts and false pretenses by the transferor," *Trib. Co.*, 10 F.4th at 160 (internal quotation marks omitted).

The existence of multiple badges of fraud strengthens the inference of fraudulent intent. Although "the presence of a single badge of fraud

may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *In re Trib. Co. Fraudulent Conv. Litig.*, No. 11-MD-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017), *aff'd*, 10 F.4th 147 (2d Cir. 2021).

The bankruptcy court ruled that the Patriarch entities were liable for conducting an actual fraudulent conveyance because it found that Tilton—whose intent is imputed to her companies—had the intent to hinder, delay, or defraud her creditors. It made this finding of fact because "[v]irtually all of the badges of fraud" were present, as evidenced by the odd structure of the transaction and how it was "conducted in haste and under a veil of secrecy." SA74–75. The district court reviewed this finding of fact and found no clear error.

On appeal, the Patriarch entities do not dispute that actual fraudulent intent maybe be proven with badges of fraud and that most of those badges were present. They instead challenge three aspects of the lower courts' reasoning. First, they contend that the standard of review for a finding of fraudulent intent is *de novo*, not clear error. Appellants' Br. at

27. Second, they argue that the bankruptcy court clearly erred in weighing the evidence as to intent. *Id.* at 27–30, 34. Finally, they assert that the bankruptcy court committed "legal error" by ignoring evidence of Tilton's subjective intent and failing to consider whether she had a legitimate supervening purpose. *Id.* at 35. None of these arguments has merit.

### 1. Actual Intent to Hinder, Delay, or Defraud Creditors Is a Question of Fact Reviewed for Clear Error.

Whether a debtor acted with the intent to hinder, delay, or defraud creditors is a question of fact reviewed on appeal for clear error only. *See In re Smith*, 321 F. App'x 32, 32 (2d Cir. 2009)[3]; *In re Wiggains*, 848 F.3d 655, 660–61 (5th Cir. 2017) (applying clear-error review to section 548(a)(1)(A)); *In re TransTexas Gas Corp.*, 597 F.3d 298, 305–06 (5th Cir. 2010) (same); *In re Sherman*, 67 F.3d 1348, 1353 (8th Cir. 1995) (same); *In re Acequia, Inc.*, 34 F.3d 800, 805 (9th Cir. 1994) (same); *In re Jeffrey*

---

[3] The Patriarch entities argue that the district court erred by relying "solely" on *Smith* for the standard of review. Appellants' Br. at 27 n.2. They note that *Smith* relied on *In re Bonnanzio*, 91 F.3d 296 (2d Cir. 1996), which addressed a different statutory provision—specifically, the intent-to-deceive element of 11 U.S.C. § 523(a)(2)(B). *Id.* at 298. But the Patriarch entities have identified a distinction without a difference. Intent, whether it is to hinder, delay, or defraud under section 548(a)(1)(A) or to deceive under section 523(a)(2)(B), is always a question of fact. *Cf. In re Miller*, 39 F.3d 301, 306–07 (11th Cir. 1994).

*Bigelow Design Grp., Inc.*, 956 F.2d 479, 481 (4th Cir. 1992) (same); *see also Freeland v. Enodis Corp.*, 540 F.3d 721, 733 (7th Cir. 2008) (applying clear-error review to Indiana's equivalent of section 548); *In re Watman*, 301 F.3d 3, 8 (1st Cir. 2002) (applying clear-error review to 11 U.S.C. § 727(a)(2)); *In re Miller*, 39 F.3d 301, 307 (11th Cir. 1994) (same).

The Patriarch entities nevertheless argue that the actual-fraudulent-intent determination should be reviewed *de novo*. Appellants' Br. at 27. The Supreme Court has rejected this type of thinly veiled attempt to subvert the standard of review and clarified that the presence of a legal issue in what is otherwise a primarily factual inquiry does not mean that the lower court's decision is entitled to *de novo* review. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1199 (2021); *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018); *see also Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 281 (2d Cir. 2021).

In any event, this Court will set aside a trial court's factual findings regarding intent "only if they are clearly erroneous." *United States v. Coppola*, 85 F.3d 1015, 1019 (2d Cir. 1996); *see also Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 182 (2d Cir. 2013) (applying clear-error review

"to the extent that the alleged error is based on a factual determination");
*Guzzo v. Cristofano*, 719 F.3d 100, 109 (2d Cir. 2013) (same); *Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 235 F. App'x 776, 780 n.5 (2d Cir. 2007) ("[W]e would still review *factual components* for clear error."). The cases cited by the Patriarch entities are not to the contrary. *See, e.g.*, *United States v. Evseroff*, 528 F. App'x 75, 77 (2d Cir. 2013) (noting that this Court reviews the "factual findings underpinning ... legal determinations ... for clear error" (citing *Coppola*, 85 F.3d at 1019)).

Here, the question of whether Tilton possessed the requisite intent is answered by looking at the facts surrounding the transaction. The bankruptcy judge, who immersed himself in the facts of this case for years and wrote an exhaustive, 100-page opinion, found that Tilton had the requisite intent. That finding, besides being entirely correct, is entitled to deference and should be reviewed only for clear error.

> **2. The Bankruptcy Court Did Not Commit Clear Error in Finding Actual Intent to Hinder, Delay, or Defraud.**

The Patriarch entities contend that "[c]ontemporaneous evidence confirms Tilton acted in good faith." Appellants' Br. at 29. Specifically, they assert that Tilton "constantly communicated" with Wells Fargo and

Carl Marks about her restructuring plan and that she intended to benefit TransCare's creditors by allocating them at least 45 percent of Transcendence's equity. *Id.* at 29–30. They describe this evidence as "overwhelming." *Id.* at 34.

The Patriarch entities have failed to show any error, much less clear error, and are simply asking this Court to reweigh the evidence. Clear-error review "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985). Here, there was "clear and convincing evidence of actual intent," *In re Manhattan Inv. Fund, Ltd.*, 397 B.R. 1, 10 n.13 (S.D.N.Y. 2007), because "[v]irtually all of the badges of fraud" were present, SA74. Even if there were any merit to the assertions about contemporaneous evidence—and there is not—the bankruptcy court's finding of actual fraudulent intent would still be a permissible view of the evidence, requiring affirmance.

Regardless, the Patriarch entities' "overwhelming" evidence is anything but. First, it strains credulity to argue that Tilton was in "constant"

communication with key stakeholders. Appellants' Br. at 29. It is undisputed that Tilton left Credit Suisse and other shareholders "in the dark about the restructuring plan," SA124 n.78, not to mention that she actively misled Credit Suisse about the Ark II credit facility. And although the record suggests that Tilton kept Wells Fargo somewhat informed, JA699(67:10–16), Wells Fargo did not participate in the planning process and was not informed of the timing and other details, SA64–65; SA117 n.48.

Second, the only support in the record for the assertion that Tilton intended to allocate 45 percent of Transcendence's equity to the term loan lenders is her own testimony, JA770–73(116:5–119:9), and a draft spreadsheet attached to an email shared between two Patriarch employees, JA1820–23. The district court described this evidence as "self-serving" and "unpersuasive." SA125 n.80. This questionable evidence also contrasts with the testimony of two of her senior advisers, who stated that they did not know how Tilton planned to distribute the shares of Transcendence. JA438–39(44:21–45:6); JA515–17(24:17–26:8).

Finally, the Patriarch entities argue that the trustee conceded that Tilton did not intend to hinder, delay, or defraud TransCare's creditors

54

when the trustee's counsel told the bankruptcy court, "I don't know that we would say that [Tilton] wasn't acting with an honest intention to reorganize or save [TransCare]." Appellants' Br. at 28 (quoting JA822–23(6:25–7:2)) (alterations in original). But the two propositions are not in conflict. As the district court explained, "Tilton's stated desire … to save jobs does not preclude the finding that she nevertheless intended also to hinder or delay TransCare's other creditors—even if just temporarily to restore affairs." SA145.

> **3.** **The Bankruptcy Court Did Not Otherwise Fail to Consider Evidence of Honest Intent or a Legitimate Supervening Purpose, Much Less Commit Legal Error.**

The Patriarch entities seek to evade the clear-error standard of review by arguing that the bankruptcy court committed two errors of law. First, they argue that it ignored the evidence of Tilton's subjective intent that showed she did not intend to hinder, delay, or defraud the creditors. Appellants' Br. at 31. Second, they contend that it failed to consider whether Tilton had a legitimate supervening purpose. *Id.*

Neither argument withstands scrutiny. The bankruptcy court did not ignore "overwhelming evidence of Tilton's innocent intent," *id.* at 32, because no such evidence exists. The only evidence the Patriarch entities

can proffer is Tilton's testimony, JA770–73(116:5–119:9), and a draft spreadsheet on the allocation of Transcendence equity shared between two employees, JA1820–23. In an opinion that already spanned 100 pages, it was not necessary for the bankruptcy court to state explicitly that it was discounting obviously self-serving testimony and unpersuasive evidence in light of the overwhelming evidence to the contrary. *See, e.g., United States v. Murdock*, 667 F.3d 1302, 1307 (D.C. Cir. 2012) (citing *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 55 (1st Cir. 1998)); *cf. P.R. Mar. Shipping Auth. v. Fed. Mar. Comm'n*, 678 F.2d 327, 351 (D.C. Cir. 1982).

The bankruptcy court also did not fail to consider whether Tilton had a legitimate supervening purpose. None of the cases cited by the Patriarch entities states that a court must make an explicit finding about the presence or lack of a legitimate supervening purpose. Moreover, the evidence for Tilton's purportedly legitimate supervening purpose is the same as the "self-serving" and "unpersuasive" evidence for her purportedly innocent intent. SA125 n.80. Again, it was not an error of law for the bankruptcy court to discount that evidence without making an explicit finding.

The Patriarch entities use the phrase "legal error" several times, but repeating it does not make it so. The bankruptcy court explained that both federal and New York law on fraudulent conveyances have a scienter requirement, that fraudulent intent is not presumed, and that the plaintiff bears the burden of proving intent. SA72–73. It then explained that badges of fraud may be used to support the inference of fraudulent intent and that "the confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud." SA73–74. Finally, it acknowledged that "significantly clear evidence of a legitimate supervening purpose" can rebut this inference. SA74 (internal quotation marks omitted).

There is no doubt that the bankruptcy court understood the legal standard for proving intent to hinder, delay, or defraud creditors. The Patriarch entities simply do not like the result. But they cannot convert the standard of review from clear error to *de novo* through baseless accusations of "legal error."

## II. The District Court and the Bankruptcy Court Correctly Determined Damages.

The courts below awarded the trustee damages for both the breach of fiduciary duties and the fraudulent conveyance. They based the damages awards on the going-concern value of the TransCare divisions in the subject collateral, relying on Tilton's projections for the future value of Transcendence. Tilton and the Patriarch entities do not challenge any figure or calculation used in the determination of damages. Instead, they repurpose several of their liability arguments in an attempt to argue that the subject collateral lacked value. But these arguments are just as unavailing in the context of damages as they are in the context of liability. The damages awards should be affirmed.

### A. The District Court Did Not Commit Clear Error in Calculating the Damages for Tilton's Breach of her Fiduciary Duties.

Tilton selected the TransCare divisions to be included in the subject collateral because she knew these divisions had going-concern value. She and her staff produced detailed projections about the value of these divisions. *See* JA2012–13. Ultimately, those divisions lost most of their value

because she breached her fiduciary duties to TransCare and its shareholders. The TransCare estate is entitled to receive damages from Tilton based on the lost going-concern value of the subject collateral.

Under Delaware law, courts have broad powers to fashion damages, including rescissory damages for breaching the duty of loyalty. *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000); *see also Thorpe ex rel. Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). "Rescissory damages are 'the monetary equivalent of rescission' and may be awarded when 'the equitable remedy of rescission is impractical.'" *In re Orchard Enters., Inc.*, 88 A.3d 1, 38 (Del. Ch. 2014) (quoting *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981)). In the case of a breach of the duty of loyalty, rescissory damages measure what the company would have received if the defendant "had not breached his fiduciary duties." *Bomarko*, 766 A.2d at 440–41.

The plaintiff bears the burden of proving damages by a preponderance of the evidence, but she need not do so with absolute precision. *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.), *aff'd*, 11 A.3d 749 (Del. 2010). "Delaware does not require certainty in the award of damages where a wrong has been proven and injury established." *Id.* (internal

quotation marks omitted). In determining damages, weight is given to contemporaneous management projections about the value of a corporation. *Del. Open MRI Radiology Assocs. v. Kessler*, 898 A.2d 290, 332 n.108 (Del. Ch. 2006).

Here, the district court applied Delaware law and concluded that the trustee should be awarded rescissory damages amounting to the lost going-concern value of the subject collateral, which it calculated to be $38.2 million. SA131. It relied on contemporaneous management projections and Tilton's testimony at trial that the annualized EBITDA of the subject collateral would be $4 million. *Id.* The district court then multiplied the projected EBITDA by the mean multiple of 10.1 calculated by the trustee's damages expert. *Id.* From that figure, it subtracted $1.2 million for the liquidation value of the subject collateral and $1 million for estimated buyer capital investment. *Id.*

Tilton can point to no error in the district court's calculation of damages, much less a clear error requiring reversal. She does not object to the application of Delaware law and rescissory damages to the breach of her fiduciary duty of loyalty. Nor does she dispute any specific calculation or estimation in the district court's valuation of damages. Instead, she

raises two general objections to the district court's analysis, both of which repeat arguments from the liability section of her brief. Neither objection has merit.

Tilton's first objection is that the trustee failed to prove harm. Appellants' Br. at 60. She contends that TransCare would have filed for bankruptcy regardless of whether she sold the subject collateral to herself. *Id.* at 61. She also argues that there was no harm because no third party would have purchased TransCare in February 2016, as evidenced by the fact that Carl Marks was hired to find a third-party buyer but failed to do so. *Id.* Finally, she contends that the district court inverted the burden of proof by faulting her for failing to provide evidence that she could not find a third-party buyer. *Id.* She argues that the burden rested with the trustee to prove that a third party actually would have purchased the subject collateral. *Id.* at 61–62.

Tilton's ipse dixit about the inevitability of TransCare's bankruptcy is a smokescreen. The action that made Tilton liable for breaching her fiduciary duties was not selling the subject collateral; it was selling the subject collateral to herself without even attempting to find a third-party buyer. The rescissory damages awarded by the district court measure

what the subject collateral would have sold for had Tilton gone through a fair sales process.

The statement that Carl Marks was hired to find a third-party buyer but failed to do so is false. Carl Marks was hired to prepare a budget for TransCare that would be acceptable to Wells Fargo. SA125; JA307. It did not fail to find a third-party buyer because doing so was never its job. That responsibility was Tilton's, and she never even tried to fulfill it.

Finally, although the trustee bears the burden of proving damages, Delaware law does not require him to do so with absolute certainty, and it certainly does not require him to identify a specific third-party buyer. *Beard Rsch.*, 8 A.3d at 613. Tilton received numerous offers to purchase all or part of TransCare, including as late as December 2015. She thought that the TransCare divisions included in the subject collateral still had value even as late as February 2016, which is why she attempted to establish Transcendence. And her own contemporaneous projections estimated that the subject collateral had going-concern value, with annualized EBITDA of $4 million. It was not clear error for the district court to conclude, based on this information, that the subject collateral had going-

concern value. Requiring a bankruptcy trustee to prove with certainty the existence of a third-party buyer—as Tilton argues should be the case here—would preclude a finding of causation in most cases and would allow wrongdoers to get away with breaching their fiduciary duties. That is not the law, and Tilton cites no authority to the contrary.

Tilton's second general objection is that damages should have been measured by the liquidation value of the subject collateral instead of the going-concern value. First, she contends that it was "gross speculation" for the district court to assume that a third party would have been willing to purchase the subject collateral at a going-concern value and that, even if there had been such a buyer, the buyer would not have made the purchase on short notice without the opportunity to perform due diligence. Appellants' Br. at 55–57. Second, she asserts that the subject collateral had going-concern value only because she injected $10 million into it. *Id.* at 58. Third, she argues that there is no basis for assuming that the subject collateral had going-concern value when there was no guarantee that TransCare would continue as a going concern. *Id.* at 59. Finally, she argues that it is particularly inappropriate to value the subject collateral

as a going concern because the trustee made it impossible for Transcendence to operate. *Id.* at 62.

It was not clear error, much less legal error, for the district court to infer that a third-party buyer would have been willing to pay going-concern value, even without the opportunity for due diligence. Tilton cites the *New Haven Inclusion Cases* and *In re Trans World Airlines, Inc.*, 134 F.3d 188 (3d Cir. 1998), as if to suggest that a court must make an explicit factual determination that a third-party buyer existed. Appellants' Br. at 56. But these cases establish no such rule. Moreover, it is not "gross speculation" to conclude that Tilton would have found a willing third-party buyer when she had received numerous offers to buy TransCare and had made no efforts to sell the subject collateral to a third party. Nor was it clear error for the district court to conclude that a "strategic third-party" would have been willing to buy TransCare's more profitable business lines even with "a condensed timeline and/or minimal due diligence." SA126. As the district court noted, Tilton "did not offer any substantive evidence" of how the trustee's damages expert, upon whose analysis the lower courts relied, "failed to account for risks" or "made inappropriate assumptions." SA137.

Tilton's assertion that the subject collateral had going-concern value only because she injected $10 million into it employs backwards reasoning. That she invested $10 million into several TransCare divisions is evidence that those divisions had going-concern value. Furthermore, the district court recognized that the subject collateral would have required a buyer to make a capital investment in order to succeed as a going concern, which is why it subtracted $1 million from the damages calculation. Tilton does not dispute that finding.

Tilton's argument that the subject collateral could not have going-concern value when TransCare was on the brink of bankruptcy is yet another example of her confusing the value of TransCare as a whole with the value of its component parts. Just as the Ferrari in the garage still has value even if the home it is in is about to be foreclosed on, so too did the profitable TransCare divisions still have going-concern value even while TransCare as a whole began to spiral into bankruptcy.

Finally, Tilton cannot shift the blame for Transcendence's failure onto the trustee. From the moment he was confronted with Tilton's ill-conceived and poorly executed plan, the trustee made a series of reasonable and responsible decisions, including not permitting Tilton to employ

ambulance drivers without paying them. Far from attempting to sabotage Transcendence, the trustee even assented to terminating TransCare's contract with the MTA so that a new contract could be negotiated with Transcendence, so long as the termination was without prejudice to the amount that was owed to TransCare. JA1609. The trustee had no part in Tilton's precipitous decisions to shut down the MTA contract and terminate Transcendence's employees, and the suggestion that the trustee "smothered Transcendence in its crib the day it was born" is as fanciful as it is colorful. Appellants' Br. at 59.

### B. The Bankruptcy Court Did Not Commit Clear Error in Calculating the Damages for the Fraudulent Conveyance.

Because the Patriarch entities are liable for engaging in a fraudulent conveyance, the trustee is entitled to recover from them the amount that was lost because of that transaction. Section 550(a) of the Bankruptcy Code provides that, when a transfer is avoided under Section 548, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). "The purpose of [Section] 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred." *Sec.*

*Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017).

Here, the bankruptcy court concluded that the value of the property was the going-concern of the divisions included in the subject collateral at the time of the foreclosure and transfer. Relying on the same contemporaneous management projections and testimony that were used in the calculation of damages for Tilton's fiduciary breach, the bankruptcy court multiplied the $4 million projected EBITDA by the average mean multiple of 10.1, arriving at a going-concern value of $40.4 million. Because the Patriarch entities had previously transferred the subject collateral back to the trustee for liquidation, the bankruptcy court subtracted from that going-concern value the $1.2 million liquidation value of the subject collateral, arriving at a damages award of $39.2 million.

The Patriarch entities raise several objections to the damages calculation, none of which has merit. First, they argue that awarding the trustee damages on top of the returned subject collateral would constitute a double recovery. Appellant's Br. at 52. But this argument fails on its own terms. When the bankruptcy court calculated damages, it subtracted

67

the liquidation value of the subject collateral—which the Patriarch entities had already effectively paid when they transferred the subject collateral back to the TransCare estate—from the going-concern value. The judgment ensures that the trustee will receive only the going-concern value of the subject collateral, not the going-concern value on top of the liquidation value.

Second, the Patriarch entities contend that the trustee should not recover the value of the subject collateral because the property was contested; its value is not readily determinable; and its value was not diminished by conversion or depreciation. *Id.* at 53–54. But the value of the property is readily determinable—Tilton and her staff determined it in numerous projections when they were planning to launch Transcendence. Moreover, the TransCare divisions that were included in the subject collateral diminished in value as a result of the fraudulent conveyance because they started at going-concern value and ended at liquidation value.

Third, the Patriarch entities make the conclusory argument that damages are unwarranted because, even if the fraudulent conveyance had never occurred, TransCare would still have gone bankrupt. *Id.* at 54.

True to form, this argument again conflates the value of TransCare with the value of its components. Although the demise of TransCare as a whole might have been inevitable, the failure of the divisions included in the subject collateral was not.

Fourth, the Patriarch entities argue that the courts below committed "legal error" by valuing TransCare as a going concern and by not requiring the trustee to prove the certain existence of a third-party willing buyer. *Id.* at 55–57. But these assertions merely repeat unsuccessful arguments that the Patriarch entities and Tilton made elsewhere in their brief. And they fail for the same reasons.

Finally, the Patriarch entities argue that there is a distinction between what a transferee gains and what an estate loses as a result of a fraudulent transaction; thus, even if Tilton benefitted from the transaction, the TransCare estate did not lose any value. *Id.* at 57–58. That distinction is irrational. It assumes that the same assets can be worth different amounts depending on whether they are owned by the transferor or the transferee. Although assets may be worth different amounts at

different points in time, their value does not change based on assumed ownership.[4]

## CONCLUSION

The Court should affirm the judgments below.

June 28, 2022

Respectfully submitted,

/s/ *Carter G. Phillips*
CARTER G. PHILLIPS
WILLIAM R. LEVI
AARON P. HAVILAND
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
cphillips@sidley.com

AVERY SAMET
AMINI LLC
131 W. 35th Street, 12th Floor
New York, N.Y. 10001
Tel.: (212) 490-4700
Fax: (212) 497-8222
asamet@aminillc.com
*Counsel for Trustee-Appellee*

---

[4] Two final points: First, the Patriarch entities suggest that the courts below abused their discretion by admitting speculative evidence about the value of Transcendence. Appellants' Br. at 59. This throwaway argument was not developed in the opening brief and does not merit a response. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001). Second, the Patriarch entities contend that because there are no actual damages, New York law requires the vacatur of the attorney's fees award against PPAS. Appellants' Br. at 60 n.4. Because there are damages, this argument need not be addressed.

# CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(g), I certify that:

This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 13,992 words, excluding the items exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ *Carter G. Phillips*
CARTER G. PHILLIPS
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
cphillips@sidley.com
*Counsel for Trustee-Appellee*

# CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2022, I caused the foregoing brief to be served on all registered counsel through the Court's CM/ECF system.

/s/ *Carter G. Phillips*
CARTER G. PHILLIPS
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
cphillips@sidley.com
*Counsel for Trustee-Appellee*